1              IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF PENNSYLVANIA

3   UNIVERSAL UNDERWRITERS INSURANCE)
    COMPANY, as subrogee of King    )
4   Chrysler Jeep Dodge, LLC and    )
    Michael M. King                 )
5                                   ) CIVIL ACTION
                 Plaintiff,         )
6                                   )
                 vs.                ) Doc. No.:
7                                   )
    DEDICATED LOGISTICS, INC.       ) 2:11-CV-01153-BNF
8                                   )
    Defendant/Third-Party Plaintiff )
9                                   )
    and                             )
10                                  )
    PENNSYLVANIA POWER COMPANY      )
11                                  )
    Defendant/Third-Party Defendant )

12                      **CERTIFIED COPY**

13

14                      DEPOSITION OF
                     GLEN F. REUSCHLING
15                   ANNAPOLIS, MARYLAND
                  THURSDAY, JULY 25, 2013
16                11:00 A.M. - 1:00 P.M.

17

18   ATKINSON-BAKER, INC.
     COURT REPORTERS
19   500 North Brand Boulevard, Third Floor
     Glendale, California 91203
20   (818) 551-7300
     REPORTED BY:  JUDITH D. VAN VLIET, CSR NO. 1924
21   FILE NO.:  A70769C

```
 1           IN THE UNITED STATES DISTRICT COURT

 2        FOR THE WESTERN DISTRICT OF PENNSYLVANIA

 3   UNIVERSAL UNDERWRITERS INSURANCE)
     COMPANY, as subrogee of King    )
 4   Chrysler Jeep Dodge, LLC and    )
     Michael M. King                 )
 5                                   ) CIVIL ACTION
                  Plaintiff,         )
 6                                   ) Doc. No.:
                  vs.                )
 7                                   ) 2:11-CV-01153-BNF
     DEDICATED LOGISTICS, INC.       )
 8                                   )
     Defendant/Third-Party Plaintiff )
 9                                   )
     and                             )
10                                   )
     PENNSYLVANIA POWER COMPANY      )
11                                   )
     Defendant/Third-Party Defendant )
12

13

14

15   Deposition of GLEN F. REUSCHLING, taken on behalf

16   of Plaintiff, at TransCon CSI, 1509 West Street,

17   Annapolis, Maryland 21401 commencing at 11:00 a.m.,

18   Thursday, July 25, 2013, before Judith D. Van

19   Vliet, CSR No. 1924.

20

21
```

```
1                    A P P E A R A N C E S

2

3    FOR THE PLAINTIFF:

4          JAMES M. GIRMAN, ESQ.

5          jgirman@pionlaw.com

6          Pion, Nerone, Girman, Winslow & Smith, P.C.

7          1500 One Gateway Center

8          Pittsburgh, Pennsylvania 15222

9          (412)281-2288

10

11   FOR THE DEFENDANT PENNSYLVANIA POWER:

12         EDWARD A. YURCON, ESQ.

13         edyurcon@ambylaw.com

14         Anstandig, McDyer & Yurcon, P.C.

15         1300 Gulf Tower

16         Pittsburgh, Pennsylvania 15219

17         (412)765-3700

18

19

20

21
```

1                    I N D E X

2   WITNESS:   GLEN F. REUSCHLING

3   EXAMINATION                              PAGE

4        BY MR. GIRMAN                          5

5

6

7

8   EXHIBITS:   (SCANNED AND E-MAILED AND/OR ATTACHED)

9   REUSCHLING        DESCRIPTION              PAGE

10

11  1  Collection of 20 photographs.................84

12  2  Photograph..................................84

13

14

15

16

17

18

19

20

21

GLEN F. REUSCHLING,

1

2 after having duly declared and affirmed under

3 penalties of perjury the testimony about to be

4 given is the truth, testified as follows:

5                    EXAMINATION

6 BY MR. GIRMAN:

7      Q      Please state your name.

8      A      Glen F. Reuschling.

9      Q      Mr. Reuschling, my name is Jim Girman.

10 I represent the defendants in a case that was filed

11 in federal court in the Western District of

12 Pennsylvania.  You're here today to give a

13 deposition.  Have you ever given a deposition

14 before?

15     A      Yes.

16     Q      I'm going to dispense with the ground

17 rules then.  If you have any questions as we go

18 along, please let me know, stop me, and I'll try to

19 clear something up if you have a question.

20     A      Yes, sir.

21     Q      How are you employed?

1      A      Self-employed.

2      Q      And who do you work for?

3      A      TransCon.

4      Q      What is TransCon?

5      A      TransCon stands for Transportation

6  Consulting, and we do two different TransCon

7  entities here.  We do accident investigation, and

8  we also do 3D laser scanning.

9      Q      Is the laser scanning a component of

10  accident investigation?

11      A      Yes.

12      Q      And when you say accident investigation,

13  is it limited to motor vehicle accidents?

14      A      No.  In the -- we have two companies,

15  TransCon Crash Scene Investigations and TransCon

16  Imaging Solutions.  And when we work for TransCon

17  Imaging Solutions, we do workmen's comp fatals,

18  non-crashes, possibly, but normally some very

19  serious injuries or death cases that involve the

20  need for a 3D laser scan of something.

21      Q      So when you get involved in a non-motor

1    vehicle related accident, is it limited to laser

2    scanning the scene as opposed to a reconstruction?

3         A      Correct.  Yes, sir.

4         Q      The only reconstruction you do is of

5    motor vehicle accidents?

6         A      Correct.

7         Q      What is --

8         A      I take that back.  We actually did a

9    murder scene up in Baltimore.  So that would be on

10   the TransCon Imaging side.  So did we reconstruct

11   the murder?  Yes, I guess we did.

12        Q      What is your position or title with

13   TransCon?

14        A      President.

15        Q      And how many employees are there?

16        A      There are five.

17        Q      How many of those employees are involved

18   in the investigation and reconstruction of

19   accidents?

20        A      Right now, just myself.

21        Q      Was there anyone else involved in the

```
 1  investigation or reconstruction of the incident at

 2  King Chrysler?

 3       A     Yes.

 4       Q     Who else?

 5       A     David Buerger, B-U-E-R-G-E-R.

 6       Q     Where is Mr. Buerger presently?

 7       A     Across the hallway.

 8       Q     Does he no longer work for TransCon,

 9  though?

10       A     He won't be working after this next

11  week.

12       Q     Where is he going?

13       A     He's going to be in charge of a security

14  detail for a private school.

15       Q     What did you do before you started

16  TransCon?

17       A     I retired as a Maryland state trooper.

18       Q     How long did you work for the state

19  police?

20       A     Started in January 1982 and had a

21  medical retirement April 1st, 1993.
```

1    Q      During the course of your employment

2  with the Maryland State Police, did you reconstruct

3  accidents?

4    A      Yes, I did.

5    Q      Of the 11 years you worked for the state

6  police, how many of those years did you spend as an

7  expert reconstructionist?

8    A      I became an accident reconstruction

9  expert for the state police in June of 1984.

10   Q      What is the title that's given to a

11  Maryland state trooper who is an accident

12  reconstructionist, an expert, what do they call it

13  within the department?

14   A      Just an accident reconstructionist.

15  It's been called different things over the years,

16  but right now, that's what it is.

17   Q      What was the nature of your disability?

18   A      I was struck as a pedestrian while on

19  the job, while working for M.S.P., at night, by a

20  tow truck, run over by a tow truck.

21   Q      And your injuries prevented you from

1    continuing as a state trooper?

2        A      Yes.   Multiple injuries.

3        Q      Do you have a college degree?

4        A      No, I have the equivalent of the credits

5    for a college degree; but because of changing

6    various curriculums, I do not.   I think I have 133

7    credits right now but never one specific

8    curriculum.

9        Q      Are you presently attending college --

10       A      No.

11       Q      -- taking a course?

12              I saw from your resume that you were

13   studying at one point at the University of

14   Maryland?

15       A      Yes.

16       Q      When is the last time you attended a

17   class there?

18       A      Probably greater than five years ago.

19       Q      What area of study have you concentrated

20   in your college education?

21       A      The answer is various, that's why I

1   don't have a degree in one specific curriculum.  It

2   was criminal justice, business, engineering, and

3   business management, I think, again, was the last.

4        Q      Okay.  You are not a mechanical

5   engineer; is that correct?

6        A      No, sir.

7        Q      You're not an electrical engineer; is

8   that correct?

9        A      No, sir; that is correct.

10       Q      I'm correct about that?  Okay.

11              Have you ever worked as an electrician?

12       A      Just at home.

13       Q      Have you ever worked for an electric

14   utility?

15       A      I have as an accident reconstructionist

16   but not as an electrician.

17       Q      Tell me about that.  How did you work

18   there as a reconstructionist?

19       A      We'd get called for accidents involving

20   vehicles that are owned by the electrical facility

21   companies.

1        Q      Can you give me a few examples of

2    reconstruction work you've done for a utility?

3        A      We've done fatal investigations for I

4    would say the equivalent of Penn Power in the state

5    of Maryland, and we've also done some injuries

6    investigations in Pennsylvania as well.  So it

7    would be the somewhat equivalent to a Penn Power or

8    some -- whatever the utility is in that state that

9    we've worked for, for accident investigations.

10       Q      Limiting it to electrical utilities,

11   when you say a fatal investigation, are you talking

12   about a vehicle into a pole, or are you talking

13   about a vehicle into a power box?  What are you

14   telling me?

15       A      Yes to both.  We've also handled

16   electrocutions, people touching wires on a -- for

17   example, on a man lift or some type of lift that we

18   did an investigation for as well.

19       Q      Have you ever testified as an expert in

20   a case involving an electric utility?

21       A      I am sure I have.  I can't pinpoint --

1  this even goes back to M.S.P. days.  I've handled a

2  lot of crashes involving, let's say BG&E, Baltimore

3  Gas & Electric, Pepco, which is P-E-P-C-O -- she

4  knows that.  And also for TransCon we've handled

5  similar, the same things, but just in a -- yes,

6  against poles, against trucks rolling over,

7  whatever.

8       Q     Have you investigated any accidents

9  where a commercial vehicle came into contact with

10 an overhead power line?

11      A     Other than -- well, the first answer is

12 that one person came in contact with an overhead

13 power line, was electrocuted while he was lifted in

14 a vehicle.

15      Q     That's an individual.  I'm asking about

16 a commercial motor vehicle.

17      A     I'm sure we've had contacts with poles.

18 I'm not sure that there has been a -- I've handled

19 over 1400 reconstructions, and I'm -- I can't

20 pinpoint one in my head.

21      Q     A slightly different question:  Have you

1  testified as an expert in a case where a commercial

2  motor vehicle came into contact with an overhead

3  power line?

4      A      I don't remember one.

5      Q      Mr. Yurcon provided me with a copy of

6  your depositions and trials from 2006, it looks

7  like, up through 2012.  Have you seen that?

8      A      I have, yes, sir.

9      Q      And I was saying 2006 because it looks

10  like the first case is a 2006 case; is that right?

11     A      Yes, sir.

12     Q      Are any of the cases on that list cases

13  where you testified involving a commercial motor

14  vehicle making contact with any type of utility,

15  whether it's a pole, a wire, a junction box,

16  anything like that?

17     A      No, sir.

18     Q      While we're looking at the list, there's

19  a case in Philadelphia, on the first page here.

20  First of all, was that case in state or federal

21  court?

1      A      State.

2      Q      And what was the case about, if you

3 recall?

4      A      The case you're referring to is 09-004,

5 Johnson versus Hip Hot in Place Paving.   It

6 involved a little five-year-old or four-year-old

7 darting out into traffic, struck by a paving

8 company pickup truck.

9      Q      And you were retained by the plaintiff

10 in that case?

11      A      No, I think it was the defendant.   Yeah,

12 that would be incorrect.   Defendant.

13      Q      Okay.   And just for the record, the list

14 I had for that case had a P next to it.   You're

15 saying that's wrong, it's actually D for defendant?

16      A      Correct.

17      Q      Is Attorney Mavros the attorney that

18 retained you on that case?

19      A      Yes, it is.

20      Q      Other than that case, do you recall any

21 other cases where you testified as an expert in

1   Pennsylvania?

2        A     Yes.

3        Q     I didn't see one on there but --

4        A     Okay.  Well --

5        Q     This may be wrong.  I mean, the list I

6   received, if there's another one that you can

7   recall that should be on there, just tell us about

8   it.

9        A     There was a Greyhound case, I would say

10  about three years ago, in Philadelphia, and I'm

11  trying to think of the case name.  I'll have to

12  look it up.  It's not on here.  But it was at least

13  three years ago, so it should have been on here.  I

14  don't know why it isn't.

15       Q     Okay.

16       A     But it was a trial two and a half weeks,

17  that's why I know, in the beautiful courthouse in

18  downtown Philadelphia.

19       Q     State court?

20       A     Correct.

21       Q     And do you remember who you were

1    retained by in that case?  Was it Greyhound or the

2    plaintiff?

3         A     Greyhound, defendant.

4         Q     Do you recall who the attorney was on

5    that case?

6         A     Half a second.  (Brief pause.)  Paul

7    Troy.

8         Q     Have you ever been precluded from

9    testifying as an expert in any court?

10        A     No, sir.

11        Q     With regard to the incident at King

12   Chrysler, what role did Mr. Buerger play in

13   TransCon's investigation?

14        A     Mr. Buerger is on the TransCon Imaging

15   Solution side of the TransCon world, and he is our

16   operations director for scanning.  So he would have

17   been the person that will be in charge of the

18   scanning, which I attended the entire time.

19        Q     With regard to the scanning that was

20   done at the King Chrysler dealership, and perhaps

21   elsewhere, describe for me what was done.

1      A      We set up various scan stations around

2  the dealership and scanned and stitched the scans

3  together for one model space.

4      Q      What is a scan station?

5      A      A location at which the unit sits and

6  then moves to another location.

7      Q      What type of scanning equipment were you

8  using?

9      A      A Leica C10 laser scanner, L-E-I-C-A.

10     Q      And is the purpose of scanning to take

11 accurate measurements?

12     A      Yes, sir.

13     Q      Is there any other purpose?

14     A      It's a great question.  No, not that I

15 know of.  It's really what it is.

16     Q      So you and Mr. Buerger scanned the King

17 Chrysler dealership?

18     A      Yes.

19     Q      Did you use the equipment for anything

20 else in this case?

21     A      We scanned an exemplar tractor-trailer.

1       Q       Am I correct that you have never

2  inspected or seen the actual tractor-trailer

3  involved in this incident?

4       A       That is correct.

5       Q       Do you think that's important in this

6  case, that you have seen it?

7       A       It would have been helpful, absolutely.

8       Q       What day or days did you go to the

9  scene?

10      A       You have to bear with me, we have 12 of

11 these volumes.  They're all against the wall over

12 there.  So if I take a while to get your answer, I

13 apologize.

14      Q       That's okay.

15      A       February 28th, 2012 -- 2013.

16      Q       And you're looking at page 1 of your

17 report; is that correct?

18      A       Yes, sir.

19      Q       If you turn to page 2, item number 6,

20 does that indicate the date that you scanned the

21 exemplar tractor-trailer?

1      A      Yes.

2      Q      That is February 26th, 2013?

3      A      Correct.

4      Q      Where did you scan the tractor-trailer?

5      A      At a Ryder facility in Maryland.

6      Q      What was the make and model of the

7  tractor that you scanned?

8      A      The same make and model of the one

9  involved in the accident.

10     Q      Do you know what that is off the top of

11  your head, or would you have to look that up?

12     A      I'd have to look it up.

13     Q      How about the trailer, what make and

14  model of trailer did you scan?

15     A      It is the equivalent van type trailer.

16  I don't think it was the exact make of trailer, but

17  it was the equivalent size that was dimensioned --

18  that the dimensions were recorded earlier.

19     Q      What height did you utilize for the

20  trailer?

21     A      I didn't utilize any height, I used the

1  trailer's height.

2      Q      The exemplar.  It was a bad question.

3  What was the height of the exemplar trailer?

4      A      Exactly, I don't know.  I'd have to look

5  in the scan.  I can tell you that way.

6      Q      If you would do that, I'd appreciate it.

7      A      Can I get somebody to do that while

8  we're --

9      Q      Sure.

10             (Brief pause.)

11     A      I know it was under 13-6.  I know it was

12  below that.  It was like 13-7 and a half or 13,

13  something like that.

14     Q      I'm sorry, 13 --

15     A      Five and a half or 13-5.  He'll tell

16  you.

17     Q      Okay.

18     A      I just don't have it memorized.

19     Q      Do you know what the measurements are

20  for the height of the trailer that was involved in

21  this incident?

1      A      I don't believe the person that did the

2   measurements had that.  But it would have to be

3   under 13-6 because that's the regulation,

4   mandatory.

5      Q      What regulation are you referring to?

6      A      Federal and state regulation for height

7   of vehicles.

8      Q      Is that in the DOT regs, is that what

9   you're referring to?

10      A      Yes.

11      Q      Do you happen to know off the top of

12   your head which regulation that is?

13      A      No.  And I don't know what

14   Pennsylvania's numbers are.

15      Q      Well, is it a national regulation or is

16   it state by state?

17      A      It is state by state, but it's the same

18   state by state, set by the feds originally.

19      Q      So that the actual regulation number may

20   vary from Pennsylvania to Maryland, for example?

21      A      Correct.

1     Q      But the height, whatever that is,

2  wouldn't change?

3     A      Correct.

4     Q      And you're saying that the regulation

5  requires a tractor-trailer unit to be no greater

6  than 13-feet-six-inches?

7     A      Correct.

8     Q      What was the purpose of the laser scan?

9  Other than measurements, what did you utilize those

10  measurements for?

11     A      Eventually what we did is we took the

12  scan data and incorporated a CAD scan hybrid

13  illustration so that we can see the methodology and

14  the path of the tractor-trailer, and also

15  specifically to see, using the exemplar vehicle and

16  the now-set lines, to see what the distance between

17  the top of the trailer to the bottom of the lines

18  would be in measurement terms.

19     Q      What height did you use for the bottom

20  of the line?  I think it's in the report.

21          MR. YURCON:  By the bottom of the line,

1        you mean the lowest phase?

2             MR. GIRMAN:   I assume that's what he

3        meant when he answered, but yes.

4        A      That's correct.   At the location of the

5   placement of the trac -- the exemplar

6   tractor-trailer from the scan, and using the scan

7   from the scene, the lowest line at that time was

8   15.9 feet.   I'm sorry.   Well, the location of the

9   tractor-trailer's location would have been 15.9

10  feet.

11       Q      Okay, I'm confused.   You say the

12  location of the tractor-trailer.   I'm sorry, but I

13  don't understand what you mean.

14       A      The tractor-trailer was placed in the

15  alley on the left side closest to the door for the

16  supply location where the tractor-trailer was

17  off-loaded.   And measuring the droop of the line at

18  different locations, the tractor-trailer would have

19  gone under the line at its measured 15.9 feet.

20       Q      Where does the 15.9 feet come from,

21  though?   Because nobody took a measurement that

1  night before the accident, correct?

2      A      Right.   This is after the accident.

3      Q      So this is after new wire was hung?

4      A      Right.   Nobody has a measurement before

5  the accident.

6      Q      All right.   Okay.

7      A      Other than the utility people that --

8  when they replaced the line, that was the only

9  measurement.

10     Q      And that was a month before the

11 accident, correct?

12     A      Right.

13     Q      In the 15-feet-nine-inches that --

14     A      (Shakes head.)

15     Q      You're shaking your head "no"?

16     A      15.9 feet, point nine.   So almost

17 exactly 16 feet.

18     Q      Okay.   15.9 feet measurement that was

19 taken after the accident, do you know who took that

20 measurement and where that comes from?

21     A      Well, we took the measurement from the

1    scan.

2         Q      Got you, okay.  So that's taken in

3    February of 2013?

4         A      Correct.

5         Q      All right.  Do you agree that there is

6    no way to determine the exact movement of the

7    Dedicated Logistics tractor-trailer through the

8    rear parking lot on the evening of the accident?

9         A      As far as prior to the pole area,

10   absolutely, I agree with that.

11        Q      Do you agree that the location and

12   number of any parked vehicles that were in that

13   back parking lot on the night of the accident are

14   unknown?

15        A      No, I don't completely agree with that.

16        Q      What do you disagree with about that?

17        A      We painstakingly went through everything

18   possible to determine how many and what vehicles

19   were back there.  And we have a series of snippets

20   of various aspects of what vehicles were back

21   there, which included pictures from inside the

1  burned out body shop looking through the windows

2  and looking through the doors, snippets from --

3        Q      If I can just ask you about that, those

4  pictures were taken after the accident.

5        A      Correct.

6        Q      Do you know if any vehicles had been

7  moved from the time those pictures were taken to

8  when the accident happened?

9        A      I'm sure some had been moved.

10       Q      So that wouldn't necessarily accurately

11 represent the location of those vehicles at the

12 time of the accident; do you agree with that?

13       A      I agree with that.

14       Q      Okay.  Go ahead.  I'm sorry, I

15 interrupted you.  Go ahead.

16       A      What I'm trying to tell you is that the

17 investigation as to what was back there included

18 using the pictures inside the body shop to look

19 through the windows and the doors to see what was

20 out there and comparing them to the on-scene

21 pictures and video -- I'm sorry, the on-scene video

1  of the fire while it was still going on.  There's a

2  snippet of -- two different snippets of videos that

3  show vehicles in the back parking lot.

4      Q      Who took the video while the fire was

5  going on?

6      A      I believe it was WTAE.  That's a guess,

7  but it's something like that.

8      Q      Is that referenced anywhere in your

9  report?

10      A      No.  Well, you mean the video?  Yes.

11      Q      Can you point that out to me?

12      A      It's on the first four pages, five

13  pages, 67 items that I looked at.  I don't know

14  where it is but...  We're looking for it now, and I

15  don't know where it is.  So you'd have to go

16  through these items and look for video.  There's

17  two videos that we looked at.  I don't know where

18  it is.  I don't see it.

19      Q      I'm looking at the items listed in the

20  front of your report, which would be pages one,

21  two, three, four and five, and I don't see it

1  either.   So if you're able to locate it in your

2  report, let me know, but I didn't see it.

3           You're saying it's a WTAE video?

4      A      Correct.

5           MR. YURCON:   I think you produced it,

6      Jim.

7           MR. GIRMAN:   Yeah, and -- maybe.   I

8      don't see it here, Ed.   That's all.

9  BY MR. GIRMAN:

10     Q      Okay.   So using -- strike that.   Do you

11 know when the WTAE video was taken?

12     A      There's two of them.   One of them is the

13 next morning, obviously in the daytime, and one of

14 them is during the fire.   You can actually see the

15 fire burning at the top of the roof.

16          And what I did is put all the pictures

17 and the snippets of the videos, which is this one,

18 in a packet.   This packet that I'm handing you is

19 multiple -- the effort made to determine what

20 vehicles are in the back parking lot.

21     Q      Okay.

1      A      And this snippet in the one video shows

2   the rear of one of the trucks that was in the back

3   parking lot during the fire.

4      Q      And just for the record, is it okay if I

5   identify this as 13-003WTAE --

6      A      Capture.

7      Q      -- capture, would that be a way to

8   identify that picture?

9      A      Yes, sir.

10      Q      And that picture shows what appears to

11   be a pickup truck, correct?

12      A      Correct.  It's a Dodge pickup truck

13   without any tags on it.  It's a brand-new one.

14      Q      And that would have been somewhere in

15   the back lot?

16      A      Yes.

17      Q      At the time the video -- is this picture

18   taken from a video or is this a separate photograph

19   from WTAE?

20      A      This is a snippet from the video.

21      Q      Got you, okay.  So that shows one

1  vehicle?

2      A      Correct.

3      Q      And the other pictures or snippets that

4  are attached show other vehicles back there when

5  the picture was taken?

6      A      Correct.  There was one other snippet

7  from the video -- I think you just said that.  The

8  bottom picture, the last picture is obviously a

9  video.  You see a hand come in the right, that's

10 the reporter's hand.  And so this is a snippet from

11 that morning, the morning after, the morning of, I

12 guess is what we should say, of the reporter's

13 report.

14     Q      Okay.

15     A      Just another snippet.  Everything else

16 are pictures, photographs.

17     Q      Okay.  That picture is also identified

18 on the back in pen as 13-003, fire burns video

19 capture?

20     A      Correct.

21     Q      Once again, do you know when that video

1    was taken the next day, whether vehicles had been

2    moved from --

3              MR. YURCON:  I'm going to object to the

4        form of the question.  Only, Jim, because my

5        understanding was that both these videos, as

6        stated in the video itself by the reporter,

7        were taken the morning of the accident, after

8        the accident obviously, but that day.

9              MR. GIRMAN:  Yeah, and I did say the

10       next day, and I didn't mean -- I misspoke.

11             THE WITNESS:  We're both saying that.

12             MR. YURCON:  He said it, too.

13             THE WITNESS:  Yeah, we're both saying

14       it, the same thing.

15   BY MR. GIRMAN:

16       Q    Do you agree when the WTAE video was

17   taken that there's no way to know whether vehicles

18   had been moved in or out of that back parking lot?

19       A    If we're talking about the last capture

20   that we just mentioned, that's correct.  During the

21   fire, which obviously you can see in the previous

1    one, I don't believe there was any way any of the

2    vehicles were moved.

3        Q     And you used the word "vehicles,"

4    meaning plural.  This picture only shows one

5    vehicle, correct?

6        A     Correct.

7        Q     So we know it's likely that particular

8    vehicle was there at the time of the accident?

9        A     Correct.  You can conclude that, as I

10   did.

11       Q     Are there any other pictures you can

12   show me in this pack that you're confident reflect

13   vehicles that were present in that back parking lot

14   at the time of this accident?

15       A     What we did in our CAD rendition in our

16   report is, per color of vehicles, we listed the

17   vehicles that we found to be consistent with not

18   moving from this, I guess that morning, in the

19   daytime.  The only video -- only capture of a

20   vehicle that shows the fire, in other words,

21   nothing absolutely was moved during the fire, is

1  this one picture.   Everything else is an attempt to

2  locate various vehicles in that back parking lot.

3          For example, I'm looking at specifically

4  Kings Chrysler files 5.19.11DSCF7838.   And that

5  photograph shows a plow the next morning or that

6  morning, I guess is the way we should say it, in

7  that position, and it also shows an old camper

8  that's backed up to the wood, woods area.   And that

9  plow that is on the front of the truck shows up in

10 a lot of the pictures, photographs that were taken

11 of the back parking lot.

12         MR. YURCON:   Excuse me.

13         MR. GIRMAN:   Sure.   Off the record for a

14     second.

15         (Brief pause.)

16 BY MR. GIRMAN:

17    Q    So the photographs that are contained in

18 this packet -- and incidentally, is it possible

19 that I could make this an exhibit, or is this your

20 only copy and it's going to screw you up?

21    A    I believe we have this -- I don't know.

34

1   I can have this either copied or --

2          MR. YURCON:  We can make a copy and make

3      it an exhibit, Jim.

4          MR. GIRMAN:  And I'm okay even if we did

5      black and white, just so we're clear later

6      which photographs we were referring to.

7          THE WITNESS:  That's what I'm asking you

8      next.  So I'm assuming you want these on the

9      back of each piece of page?

10  Q      If it's possible?

11  A      Absolutely.

12  Q      Just keep them for one second, if you

13  don't mind.

14  A      Absolutely.

15  Q      So my original question that started us

16  down this path was, do you agree that you're not

17  able to provide me with the exact location and

18  number of any parked vehicles that were present in

19  that back parking lot at the time of the accident?

20          MR. YURCON:  I'll object to the form of

21      the question.

1      Q      And based on your testimony, am I

2  correct that the only one you can say with any

3  confidence is that WTAE video picture that shows a

4  pickup truck while the fire is burning?

5      A      That is correct.  And then I guess we'd

6  have to add the driver's testimony that there was

7  15 to 20 vehicles in the back parking lot, I guess,

8  location unknown.

9      Q      Okay.  Referring to the driver's

10  testimony, you're aware that he has testified that

11  he also backed up twice --

12      A      Yes, sir.

13      Q      -- during -- all right.

14         And would you agree with me that there's

15  no information about where he backed up?

16      A      That's also correct.

17      Q      Do you agree that there is no evidence

18  to indicate the movement of the Dedicated Logistics

19  tractor-trailer through the rear parking lot on the

20  night of this accident?

21      A      That's correct.

1      Q      All right.  You were able to ascertain

2   the height of the exemplar trailer?

3      A      That's correct.

4      Q      What is the height?

5      A      13.302 feet.  So that's approximately

6   13.4 inches -- 13-feet-four-inches.

7      Q      Okay.  In reviewing the report that

8   you've prepared in this case, am I correct that

9   it's your opinion that the passenger side of the

10  Dedicated Logistics trailer made contact with the

11  guy wire anchor?

12     A      Yes.

13     Q      Which axle of the trailer?

14     A      It'd be the first axle right.

15     Q      And what part of the tire made contact

16  with what part of the anchor?

17     A      I don't know the part of the tire,

18  whether the tread section made part -- contact with

19  it or the sidewall of it.  But the tire itself

20  or -- and the rocker panel of the trailer is also

21  another possibility, it could have made contact

1   with the guy wire.

2       Q       Is there anywhere in your report that

3   you indicate that the rocker panel is what made

4   contact with the anchor?

5       A       No.

6       Q       And am I correct that your report

7   indicates that the tire is what made contact with

8   it?

9       A       Exactly.

10      Q       And is it your opinion that the contact

11  with the anchor caused the anchor to bend?

12      A       The resultant contact is consistent with

13  a bending of the anchor, yes.

14      Q       Is it your opinion that the sidewall of

15  the tire coming into contact with the anchor could

16  cause it to bend?

17      A       Well, not just the sidewall.  It could

18  have been the crown of the tire.  That's why it's

19  unknown as to what part of the tire made contact

20  with it.  There's the tread, there's the crown,

21  there's the sidewall, there's the bead, there's

1   multiple locations.

2        Q       What's the crown?

3        A       That's the part between the tread and

4   the sidewall, the edge.

5        Q       All right.  Would a operator or

6   passenger in the tractor feel the crown running

7   over an anchor, this anchor?

8        A       It's possible, yes.

9        Q       What would the sensation be, if you

10  know?

11       A       Some type of retardation on the

12  tractor's part.

13       Q       Meaning what?

14       A       It slows down, decels, like a bump.

15       Q       Okay.  The same question, if it was just

16  the sidewall that hit the anchor, would a driver

17  and/or passenger feel that?

18       A       Less than the first answer.

19       Q       Is it your opinion, and if I've asked

20  this, I apologize, but is it your opinion that the

21  sidewall only coming into contact with the anchor

1    could have caused the bend in the anchor?

2        A    No.

3        Q    It could not?

4        A    I don't believe so.

5        Q    So at a minimum, it's your opinion that

6    the crown would have also had to come into contact

7    with it?

8        A    Correct.

9        Q    Have you examined the anchor?

10       A    Yes.

11       Q    What part of the anchor, using from the

12   ground up, was contacted by the tire?

13       A    It's my opinion it's the eyebolt hole

14   area as well as part of the shaft, but I don't

15   know.  But at least the eyebolt part of the anchor.

16       Q    And how high off the ground does the

17   eyebolt start?

18       A    I believe it's two feet.  I'd have to

19   look at the scan, but I think it's somewhere around

20   two feet.

21       Q    Did you examine the actual anchor

1   involved in this accident?

2      A      Yes.

3      Q      And that was -- it was out of the ground

4   when you examined it, correct, it was loose?

5      A      It was in a vehicle, the back of a

6   vehicle.

7      Q      And the scan you referred to, is that

8   the replacement anchor --

9      A      Yes.

10      Q      -- the scan?

11             Okay.  Using the anchor that was

12   involved in the incident, were you able to tell

13   from examining it how much of it was in the ground

14   and how much of it was aboveground?

15      A      Yes.  I would have to go to the

16   photographs that we took, which has a tape on it.

17   And I'm looking in my report to see if there's

18   anything else.

19             Yes.  There's a -- on page 22, figure 10

20   and figure 11 show what I'm talking about.

21      Q      They show the anchor?

1      A       Yes.

2      Q       Based on those, can you tell me how much

3  of the anchor was above ground level?

4      A       I'd have to pull these pictures up to

5  really look because I really can't see the tape

6  measure.

7      Q       But it's your opinion that the tire came

8  into contact with the eyelet?

9      A       That area, yes.

10     Q       Okay, and forgive me for quibbling, but

11 that area can be a large area.  Is it the -- would

12 you agree with me that the eyelet is at the top of

13 the anchor?

14     A       Yes, sir.  It's about -- the total

15 eyelet area is about three and a half inches.

16     Q       Okay.  Do you know what part of the tire

17 would have come into contact with the eyelet?

18     A       As testified earlier, somewhere around

19 the crown area of the tire.

20     Q       Okay.  Did any part of the tire come

21 into contact with the anchor beneath the eyelet?

1     A     I don't know.  I don't have any evidence

2  of that.

3     Q     Was there anything on the anchor itself

4  that supports your conclusion?

5     A     No, sir.

6     Q     You saw no evidence of any contact with

7  the tire?

8     A     There is some discoloring below the

9  anchor eyelet bolt.  Whether that is part of the

10  contact or not, I don't know.  It's been so long

11  since the incident that this piece of metal had

12  changed colors through oxidation, so I don't know.

13     Q     Would you expect there to be rubber

14  residue from the tire on the anchor?

15     A     From impact --

16     Q     Yes.

17     A     -- with the tire?

18     Q     Yes.

19     A     Yes.

20     Q     And am I correct that you didn't see any

21  rubber residue on the anchor when you examined it?

1      A      But you didn't ask that; you said when.

2  You didn't ask the one question: when.  I would

3  expect to see it if I was there that night, but not

4  expect to see it when I inspected the anchor pole

5  much, much later.

6      Q      Would you agree with me that rubber

7  isn't going to oxidize or change?

8      A      That's correct.

9      Q      So why wouldn't you see rubber months

10  later or a year later when you examined it?

11     A      I don't know how many people handled

12  this.  I know it's in the back of a car, so it's

13  multiple times that it's been moved.  I don't know

14  if the oxidation is now discarding or superimposing

15  on any marks that were there when this incident

16  happened.  So it's difficult to tell, when I take

17  an examination of it, as to exactly identifying the

18  contact.

19           As you can see in Exhibit figure 10 --

20  not exhibit but figure 10, the anchor and the

21  eyelet area is discolored, and there are black

1   marks on it, there are oxidation marks on it.   We

2   have multiple pictures at different angles of this

3   thing.   There's rust marks on it.   There's multiple

4   different things.   To associate it with various

5   aspects of contact, it's difficult.

6          One specific thing, if you look at

7   figure 10, if you look down and around the six- and

8   seven-inch mark, you can see some black striations

9   in an angular position, almost diagonal to the

10  shaft itself.   Is that part of a contact or the

11  result of a contact?   I don't know, but it's

12  consistent with marking of some type.

13     Q     But you can't say with any certainty,

14  expert opinion, that that is contact from this

15  tire; is that fair?

16     A     Not from this tire or any other tire.

17  It looks like it's -- to me, it's consistent with

18  contact.   Of course, when I investigated this or

19  saw this in February, versus the date of the

20  accident, I don't know.

21     Q     Okay.

1        A      It's just obvious to me from doing

2   multiple accidents, and looking, and being trained

3   in various aspects of contact damage, that this

4   anchor has been contacted.   Whether it's by this

5   tire that we're talking about or other tires or

6   however, I don't know.   But what the image itself

7   shows is contact.

8        Q      Have you ever investigated any other

9   accident where you were asked to determine whether

10  an anchor, a guy wire anchor, was bent from

11  contact?

12       A      No.

13       Q      So this is the first one?

14       A      Yeah, but it's not any different than

15  contact with something else.   But yes, this is

16  absolutely the first time.

17       Q      Would you agree with me that an anchor

18  could bend if it's being pulled, there's force

19  being exerted on it from the top, from where the

20  eyelet is?

21       A      I don't know.   I don't know which way

1    the force is coming from.  If it's coming straight

2    from the guy wire, I would expect it to go straight

3    up into the eyelet itself, and the force is acting

4    upon that eyelet.

5              This is a seven-foot, I believe, anchor,

6    if I'm remembering it right.  How it's positioned

7    in the ground and its angle, because some of them

8    have angle already to them, it all depends.

9         Q    Do you know if this particular anchor

10   had angle to it?

11        A    No.

12        Q    Prior to the accident.

13        A    Don't know.

14        Q    Okay.  You're aware that the anchor had

15   a wire that was connected to it that led up near

16   the top of the telephone pole or utility pole,

17   correct?

18        A    Right, I believe attachment was about

19   two feet lower than the top of the pole.  I think

20   it was attached twice, if I remember right.

21        Q    Do you agree that there was a bend in

47

1    the anchor after the accident?

2         A    This anchor that we're looking at --

3         Q    Yes.

4         A    -- figure 10?   Yes.

5         Q    Do you know whether that bend was caused

6    by the pole falling into the building?

7         A    No, sir.

8         Q    You don't know?

9         A    No.   I wasn't asked to look into that.

10        Q    Well, is the fact that you believe there

11   was contact to the anchor because the anchor was

12   bent?

13        A    It's consistent with other things.   Yes,

14   is the answer.   And it's consistent with multiple

15   foundation things, other things, like the testimony

16   of the driver, the testimony of the passenger; the

17   methodology and protocol and procedure and path of

18   the tractor-trailer; the placement of vehicles in

19   the back parking lot to offset its turning and

20   articulation location; the width of the alleyway

21   that it needs to go through; the location of the

1   anchor in the alleyway in which it has to go

2   through.  And, how those positions are consistent

3   with or inconsistent with the placement of the

4   vehicles in the back parking lot for him to make

5   this turn.  All that in connection with, we have a

6   bent anchor and a specific length of

7   tractor-trailer and a specific dimension of an

8   articulated vehicle, and we have a pole that falls

9   into the building, yes, I believe it is connected

10  and is very consistent.

11       Q    Would you agree that the driver in this

12  case, Earnell Harris, testified that he didn't

13  contact that anchor?

14       A    I would expect him to say that, yes,

15  sir.

16       Q    Why would you expect him to say that?

17       A    People have a problem with saying fault

18  everywhere.  I've done this for 31 years, back in

19  the state police days, and people have a serious

20  problem with understanding what they did or taking

21  upon the fault of what happened.

1      Q     You'd agree that there's a lot of

2    drivers that give you the truth about an accident,

3    don't they?

4      A     No -- a lot, if you're talking two or

5    three percent, yes.

6      Q     In your experience, two to three percent

7    of drivers tell the truth about how an accident

8    happened, the other 97 percent lie?

9      A     No, I didn't say they lied.  You didn't

10    ask that.

11      Q     Okay.

12      A     What they --

13      Q     Well, they don't tell the truth?

14      A     What the difference is, is -- and that

15    includes myself or you or anybody sitting in this

16    room, they believe this is how an incident

17    happened.

18      Q     Okay.

19      A     Then they start to -- that belief

20    becomes concrete, and then that becomes their

21    opinion.  When physical evidence and reconstruction

1   occurs, it's not exactly what happened, and it's

2   altered in some way.  So that person is never

3   altered because, as I said, it's in concrete.

4          It starts when you're a little kid and

5   you have a problem and an accident.  When you have

6   an accident, obviously that's what diapers are for,

7   but that's where it starts.  It starts when we're

8   little kids about what is an accident and fault and

9   then fessing up to it and exactly what happened.

10         So it's a very, very interesting thing

11  after multiple, multiple accidents, to listen to

12  people, including myself.  I would witness an

13  accident occur, and then not until I reconstruct it

14  did I find that I was a little off on this and a

15  little off on that and correct and accurate on

16  this.  So it's not that you're lying, it's that

17  you're not accurate.

18     Q     Okay.  When was it that you inspected

19  the anchor?

20     A     February 28th, when I was there.

21     Q     Okay.  So the same day you went to the

1   scene is -- did somebody bring the anchor for you

2   to look at?

3        A    Yes.

4        Q    Somebody from Penn Power?

5        A    I honestly don't know who it was.  It

6   was in the back of a SUV.  It wasn't in a Penn

7   Power truck.

8        Q    When this tractor-trailer was stopped in

9   the driveway or alley making the delivery, what

10  direction was the nose of the tractor pointing?

11       A    I'm going to guess on direction.  I

12  think it was east?

13       Q    I think it's west.

14            MR. YURCON:  West.

15       Q    I'm not trying --

16       A    It was either or.

17       Q    -- to trick you.  I want to ask you some

18  direction questions --

19            MR. YURCON:  It went in west, it came

20       out east.  All the testimony --

21       A    I understand you weren't trying to trick

1   me, but I was just guessing.  I knew it was either

2   or.

3        Q    All right.  For purposes of my

4   questions, can we agree it was west?

5        A    Absolutely.

6        Q    All right.

7        A    Yes, sir.

8        Q    Do you agree that prior to the accident

9   happening, that the anchor was located north of the

10  wooden utility pole?

11       A    Yes.

12       Q    All right.

13       A    Wait.  I'm sorry.  Yes.  That's correct.

14            MR. YURCON:  What was your question

15       again?

16            Can you read it back, ma'am?

17            (The question is read by the reporter.)

18  BY MR. GIRMAN:

19       Q    Are you going to offer any expert

20  opinions about what force was exerted on the

21  utility pole when the tire came into contact with

1    the anchor?

2          A     No, sir.

3          Q     So you're not going to testify in any

4    manner as to how much force was needed to break the

5    pole; is that fair?

6          A     That's correct.

7          Q     You're not going to testify in any

8    manner as to the direction of force caused by the

9    tire coming into contact with the anchor?

10         A     That's correct.

11         Q     Are you going to offer any opinions

12   regarding the direction that the anchor bent when

13   contacted with the trailer tire?

14         A     Great question.  Didn't consider it.

15   And I would have to answer I don't think so.

16         Q     I think we talked about the regulation

17   for height of a trailer.  I don't think I asked you

18   about the minimum height for an overhead electric

19   service line in Pennsylvania.  Do you know what

20   that is?

21         A     No, sir.

1     Q      Am I correct that you do not dispute

2   that the corner of the trailer caught on the

3   service line and pulled the pole in this case?

4     A      I do dispute that.

5     Q      Would you turn to page 21 of your

6   report?

7     A      Yes, sir.

8     Q      And look at paragraph 11.

9     A      I see it.  It says the top right front

10  area of the trailer then caught the now-lowered

11  bottom phase line.

12    Q      Now that you've read that, was my

13  statement correct?

14    A      Your statement was correct.  I am unsure

15  as to that aspect of the case.  It could have at

16  that point, depending on the timing, but I don't --

17  I don't know.

18    Q      But that's what you put here, correct?

19    A      It absolutely is.

20    Q      The next sentence after that states:

21  The secondary contact, and then in parenthesis you

1    have, top of trailer to bottom phase line pulled

2    the bottom phase line tight which in turn pulled

3    the pole toward the showroom/body shop.  That's

4    what you wrote, correct?

5         A     Yes, sir.

6         Q     Is that your opinion?

7         A     It is a possibility, yes, sir.

8         Q     I don't mean to quibble with you, but is

9    it your expert opinion that that's what happened or

10   is it only a possibility such that it's not --

11   you're not going to render an opinion?

12        A     I believe it's just a possibility, sir.

13   I wasn't asked to look into it after contact, to

14   tell you the truth.  After contact was made, my

15   attempt to determine as to the phase of -- the next

16   phase that occurred was, I guess, number 11 on

17   page 21.

18        Q     So can we strike number 11 from your

19   report?

20        A     Well, I still say it's a possibility of

21   the event occurring.  I don't think I would strike

1  it.  It's just whether it's probable or not, I

2  don't know.  It's more likely than not that that

3  could have occurred, or it's more likely than not

4  that it couldn't have occurred -- or wouldn't --

5  didn't occur, I guess, after the contact was made

6  with the anchor.

7      Q      Why do you say that?  Why do you say

8  it's possible it could have and possible it

9  couldn't have?  Explain that to me.

10      A      Well, we do know that after contact was

11  made with the anchor that something had to give,

12  and that something would cause the lowering of the

13  phase lines.  And then if we are going to move to

14  the next idea of the sequence, then what caused the

15  pole to break?  And I never went down that phase,

16  to that part.  That's where Mr. Simpson took over.

17           Is it possible that something snagged

18  the wire at that point?  I don't know.  I guess

19  anything's possible at that point.  Could it have

20  made contact with the trailer at that point?  Sure.

21  Is it possible that the pole itself was snapped by

1    just the contact of the anchor?  I don't know.  I

2    think that's possible, too.  But that's not really

3    my bailiwick in this case.  It's kind of an attempt

4    to try to answer your question.

5        Q    Yeah, I -- really, I just want to make

6    sure that you're not going to offer testimony about

7    what caused the pole to snap.

8        A    No, sir.

9        Q    And I want to find out if you're going

10   to offer testimony about whether or not contact

11   with the anchor would have resulted in the trailer

12   coming into contact with the bottom phase line.

13       A    It states what it does state, and I

14   stated in my response that the possibilities exist.

15   That's right where the responsibility of my input

16   in this case kind of ends, and so the attempt to go

17   one more step is basically the result of number 11.

18   It's the easiest way to explain it.  I'm sorry if

19   it's convoluted.

20       Q    Your report contained photographs that

21   are referred to as figures, correct?

1      A      Yes, sir.

2      Q      If you'll look at figures 19 through 21,

3  I want to ask you a couple of questions.

4      A      Yes, sir.  Well, when you say it that

5  way, these are not photographs.  Your first

6  question --

7      Q      Yeah, what are they?

8      A      -- was a little different.

9      Q      What would you call them?

10     A      These are snippets of 3D laser scan and

11  a CAD rendition of the back parking lot, both.

12  They include both.

13     Q      Okay.  And am I correct that snippets

14  are representations of that back parking lot at

15  different points in time in different locations

16  based on information that you provide?

17     A      That I provide?  That was given.

18     Q      Okay.

19     A      Information that I was given.

20     Q      And you plug in to the figure?

21     A      Correct.

1      Q      All right.  Just give me a minute.  I

2  want to get to my color copies.

3             How did you determine the placement of

4  the tractor-trailer for figures 19 through 21?

5      A      Well, it begins with the testimony of

6  the driver and passenger as to, first of all, where

7  were they, where did they drop off the parts, and

8  that begins on figure 12.  That places the

9  tractor-trailer on the left side of the alleyway,

10 looking -- facing east -- am I guessing again?

11            MR. YURCON:  Facing west.

12     Q      I think it's west.

13     A      I'm sorry.

14     Q      You even have it in your figure there.

15     A      Okay.  And then it goes -- I'm writing

16 it down so I don't mess up the next time.  Then it

17 goes to figure 13-14, but only based upon the

18 driver's testimony that he went to the right to

19 make his U-turn in the back parking lot.

20     Q      So where you, for example, where you

21 have the tractor-trailer in figures 13 and 14,

1    that's an assumption on your part based on what

2    you've reviewed --

3        A    Absolutely.

4        Q    -- correct?

5        A    Yes, sir.

6        Q    All right.  Go ahead.

7        A    Then, again, it continues with the same

8    assumptions, based upon our effort to determine

9    what cars are in the back parking lot and the back

10   parking lot dimensions that 15 and 16 occurred, in

11   some fashion; 17 and 18 occurred in some fashion,

12   and it's at what -- it's between 18 and 19 that the

13   vehicles in the back parking lot would then alter

14   the driver's approach to the alleyway again.

15           And in figure 18, the truck just to the

16   left driver's side of the tractor that you see the

17   rear of is placed in the attempted exact spot,

18   within a foot or two, I would say, of where the

19   picture of the Dodge pickup with the plow on it was

20   that we talked about earlier.

21           The photograph of the truck, the Dodge,

1    brand-new Dodge pickup truck depicted in the fire

2    scene that we named 13-003WTAE capture is actually

3    to the right of that white pickup truck with the

4    plow on it, based upon this capture in the video.

5    Because you can see the pole still standing -- I'm

6    sorry, not still standing, but the pole up against

7    the building in a straight configuration

8    perpendicular, and we know that this truck that's

9    in this capture that we're talking about is to the

10   right based upon the angle of this picture.  We

11   just don't know is it in the front position in a

12   parking spot or is it in the same line as the Dodge

13   with the plow on it?  But we do know it's to the

14   right of it based upon this image from the video.

15        Q     If I can just ask you, and you're

16   talking about figure 18, correct?

17        A     Yes.  Yes, sir.

18        Q     And there looks to be a white pickup

19   truck which would be the one closest to the right

20   of the figure --

21        A     Correct.

1      Q      -- is that right?

2      A      Correct.

3      Q      And you're saying that the pickup truck

4  that's shown in the WTAE video may have been to the

5  right of this white pickup truck or may have been

6  in front of it?

7      A      It may -- well, either way, it's to the

8  right.  We don't know -- this pickup truck is in

9  the second row back of parking versus the first row

10  closest to the pole.  So the video, all attempts

11  were made to determine which lane, which line of

12  parking it would have been in.  I don't know.  It

13  was either in the first line or the second line for

14  sure based upon this image and where the camera

15  person taking the photo is standing.  So it would

16  have to be to the right.  We don't know how far to

17  the right, but obviously not past the location of

18  the pole almost in this image figure 18.

19      Q      But this -- is the white pickup truck

20  that you have placed in figure 18, is that supposed

21  to be the truck with the plow on it?

1        A       Yes, sir.  The same pickup truck.

2        Q       Okay.  Go ahead, you were --

3        A       Therefore, when we go to 19...answering

4    your question; I apologize on the delay getting to

5    it...is that we still have a vehicle to the right

6    of the white truck image in the image figure 19

7    that the tractor-trailer must traverse around, and

8    as well as figure 20, which has a little bit more

9    of a birdseye of the vehicle.

10            So the image in the video would be that

11   truck would be basically somewhere around to --

12   just to the right of that red curved arrow is my

13   opinion.  I just don't know what lane it was in,

14   so.  But my best recollection and best on being

15   there and best idea of what this image shows is my

16   opinion is that truck that we see in this capture

17   of the video is just to the right of that curved

18   right -- I'm sorry, curved left arrow in figure 12.

19   And therefore it alters the truck driver's turning

20   and articulation into preparing to make it back

21   into the alleyway.

1          Q     And just so I'm clear, your reason for

2     stating that the pickup truck was near that red

3     arrow as --

4               MR. YURCON:   In which figure, Jim?

5          Q     Figure 20 --

6          A     Yes.

7          Q     -- is based on the one photograph we

8     have from WTAE that we've talked about as 13-003?

9          A     Correct.

10         Q     And you place it based on this

11    photograph only, correct?

12         A     Well, I didn't place it.

13         Q     All right.   You've testified that it's

14    near -- somewhere near that red arrow, and it's

15    based on this photograph only?

16         A     Right.   That's why I didn't specify the

17    placement in this at all.   Because the other

18    vehicles I was able to absolutely place within a

19    foot or two of each other -- or, I'm sorry, within

20    a foot or two, at the most, of its exact placement.

21               And what we did is, you'll see in --

1    well, it's better to see it on figure 19 if you

2    back up.  You'll see the back parking lot has a

3    gray matter to it.  The light gray is the actual

4    scan.  And when we measured -- I'm sorry, when we

5    scanned this back parking lot, the parking lot was

6    full of cars.  So we had to fence out the cars and

7    then place in the cars in CAD with a patch and put

8    each car in, based upon these pictures, our attempt

9    to determine what's in the back parking lot.

10           So we get to the most critical part of

11   this turn of the tractor-trailer, which is what

12   we're talking about, figure 19 and 20, in the

13   preparation to get back into the alleyway, and we

14   have one vehicle, which is the plow vehicle, the

15   back of the white Dodge pickup truck, that we're

16   pretty sure was probably there at the time of the

17   accident, although it doesn't show it in this one

18   snippet in the -- unfortunately, in the video.  And

19   then taking that positioned car, the plow car,

20   vehicle, truck, and looking at the snippet, that

21   vehicle in the snippet that we're discussing with

1  the fire in it, this brand-new Dodge pickup truck

2  absolutely has to be to the right of the plow --

3  the plow vehicle.  I just don't know where to the

4  right, but it would alter the turning radius path

5  of the tractor-trailer.

6      Q      Is that based on the fact that you don't

7  see the plow vehicle in the photograph 13-003?

8      A      Right.  And also when you review the

9  video very closely, you don't see it either.  This

10  is the only vehicle you see, so -- and it's a very

11  quick snippet of the video when you go through this

12  video.

13      Q      Incidentally, does the vehicle that's

14  shown in this video appear to have its lights on?

15      A      It's reflectors.  They're reflectors.

16  Yes, it appears that way.  Yes is the answer.

17      Q      And you're saying they're not on.

18  They're actually reflectors that are on the

19  vehicle?

20      A      Yes.

21      Q      Do you know where the light is coming

1   from that's reflecting on the vehicle?

2        A      The light from the flash of the camera.

3        Q      This is a video camera, correct?

4        A      Then it would be the video, right.

5        Q      There wouldn't be a flash on the video,

6   right?

7        A      You're absolutely right.

8        Q      So do you know where that's coming from?

9        A      The video camera.

10       Q      Just the video itself, the camera

11   itself?

12       A      Yes.  Or somebody's flashlight or

13   something.  You can see how the back, which is a

14   vertical 90 degrees, is lit up, and you don't see

15   too much more of the other part of the truck.

16   There isn't any tag on it.  There's testimony that

17   there were vehicles back there.  There's testimony

18   from talking to various people at the store that

19   the -- the dealership, that they had to move

20   vehicles later.  But this one has it with the

21   actual fire going on.

1      Q      Did you review my expert, Al Dunn's

2  testimony before your deposition today?

3      A      Yes.

4      Q      Did you read his whole deposition?

5      A      Yes.

6      Q      Do you agree that Earnell Harris stayed

7  within the King Chrysler parking lot when he

8  executed his turn in the back alleyway -- or, I'm

9  sorry, in the back lot?  And the turn meaning the

10  one that you show in figure 19.

11      A      I apologize with asking the question

12  back to you.  Can I repeat what I think you said?

13      Q      Sure.

14      A      I think you said did he stay within the

15  King's dealership parking lot?

16      Q      Yes.

17      A      Yes.

18      Q      Okay.  You're familiar with there being

19  a property adjacent to the parking lot, correct?

20      A      Correct.

21      Q      And it's your opinion that he did not go

1    into that parking lot?

2        A    He couldn't have, no.  That's correct.

3    There's no way he could have.  The terrain doesn't

4    allow you to do it.

5        Q    Figures 22 through 32 are intended to

6    show the location of the tractor and trailer when

7    the trailer tire impacted with the anchor; is that

8    correct?

9        A    Correct.

10       Q    And the CAD software that you use does

11   not show the continuous movement of the

12   tractor-trailer from figures 19 through 21 to

13   figures 22 to 32; is that correct?

14       A    Correct.

15       Q    Have you seen Mr. Dunn's supplemental

16   expert report in this case?

17       A    Yes, sir.

18       Q    Do you agree with the simulation of the

19   movement of the tractor-trailer shown in figures 4,

20   5, 6 of his report?

21       A    This is the supplemental one?

1      Q      Yes.

2      A      And your question was do I agree with

3   his positioning of the tractor-trailer in figure 4,

4   5, 6 of the supplemental report, correct?

5      Q      It was actually, do you agree with the

6   simulation of the movement of the tractor-trailer

7   shown in figures 4, 5 and 6 of his report?

8      A      If I agree with the movement only?  Yes,

9   it could have been the movement of a

10  tractor-trailer through this position.

11     Q      Do you agree that the trailer would have

12  off-tracked to the left as Mr. Harris was making

13  his left turn?

14     A      Prior to entering the alleyway?

15     Q      Yes.

16     A      Just as I do in my report, yes.

17     Q      Do you agree with the conclusion that,

18  based on the movement as shown in figures 4, 5 and

19  6, that the trailer misses the anchor?

20     A      He has it missing the anchor, correct.

21     Q      And you have it hitting the anchor.

1    What's the difference?

2        A      Well, interesting enough, you didn't

3    include figure 7, which he has it hitting the

4    anchor.   Was there a reason for that?

5        Q      Figure 7 of his report?

6        A      Yes.

7        Q      Let me get that.   What do you believe

8    figure 7 shows?

9        A      Well, I don't have to interpret it.   It

10   says guy wire, anchor and tire contact.

11       Q      Is that figure 7 a re-creation of your

12   figures 22 through 32?

13       A      It doesn't say TransCon, it says example

14   of one scenario in which the right front corner of

15   the Dedicated Logistics trailer could not contact

16   the overhead service conductors if the right tire

17   on the leading trailer axle impacted the guy wire

18   anchor.

19              So what he's stating is, in this

20   configuration, figure 7, this articulation of this

21   specific truck through his simulation, if the first

1  axle right was to contact the guy wire anchor, as

2  stated earlier and testified to, that the right

3  front corner of the trailer would have been past

4  the location of the lowest phase of the wires going

5  across the alleyway.

6          That's why I said the possibility exists

7  that there could have been contact with one of the

8  wires and there couldn't have been; possibly both

9  ways.  And -- Mr. Dunn, is it?

10      Q    Correct.

11      A    -- even states that in figure 7.  He

12  actually illustrates the exact comment to one of

13  your questions you asked earlier about my

14  number 11, I believe, in my report.  About whether,

15  you know, the front corner hit the phase or not.

16  He illustrated it for us in figure 7 that, in his

17  opinion, based upon contact with his animation --

18  I'm sorry, simulation, that it didn't contact the

19  front top of the trailer, but still contact is made

20  with the anchor.  Which is extremely interesting.

21      Q    But don't you agree that his figure 7 is

1  a re-creation of your figures 22 through 32; that's

2  where you placed it?

3      A     That's not where I placed it.  And

4  that's what's so interesting.  He doesn't say that

5  in his description of figure 7 that this is

6  TransCon's opinion.  If you look at figure 7 and

7  then you go to my report and --

8          MR. YURCON:  I have my copy if you don't

9      have it.

10          THE WITNESS:  No, no, no.

11     A     And you go to my report where we were in

12  figure 22, figure 23, figure 24, 25, 26

13  specifically look at the location of the tractor.

14  This is not TransCon's interpretation, this is Mr.

15  Dunn's interpretation:  If the trailer makes

16  contact with the anchor, this is how it would have

17  made contact with the anchor.

18          In this illustration, he is trying to

19  express to the reader, the viewer -- "viewer" being

20  the person looking at the figure and the reader

21  reading the report -- only about the contact with

1  the phase of the front of the trailer, but yet he

2  has the anchor being struck.  That's why I answered

3  it's possible, it's possible not, either way, that

4  it would have made contact with the front of the

5  trailer.

6          You see my tractor has -- the way 22 is,

7  is very close to the compressor room itself and

8  still making contact with the anchor.  In his

9  illustration figure 7, he's -- almost has the

10  tractor directly in the center of the alleyway,

11  which couldn't have happened because of the

12  positioning of those cars that we placed in the --

13  and specifically the vehicle we were talking about

14  in the fire scene, because of the off-tracking.

15      Q      So you're saying that the truck could

16  not have off-tracked in the manner that he's shown

17  there because it would have struck that vehicle?

18      A      Yes.  But here's the thing that's

19  different.  In figure 7, if you look very closely,

20  he doesn't illustrate that this was a simulation, a

21  continuous simulation.  He only does that in figure

1   6.   And if you see the difference between the

2   tractor's positioning in the alleyway, in figure 6

3   the tractor is very close to the compressor room,

4   which is exactly the way I have in mine, figure 22.

5   But yet, in figure 7, he has the tractor in the

6   middle.   He does not have the path, he does not

7   have the off-tracking that occurred in the back

8   parking lot whatsoever, as he does in figure 6.   He

9   completely moved the tractor out of the way,

10   completely moves the trailer in a different

11   position, and still makes contact with the anchor

12   positioning bolt.

13        Q     You've read Mr. Dunn's deposition,

14   correct?

15        A     Yes.

16        Q     And you agree with me that he's

17   expressed an opinion that the tractor-trailer did

18   not make any contact with the anchor?

19        A     Yes.

20        Q     All right.

21        A     That's what was confusing.   I just read

1    it last night and today as I just got it, and yet

2    his report says it does.

3        Q    Well, this is a supplemental report,

4    isn't it?

5        A    Well, sure, you can call it what you

6    want.  I thought it was a rebuttal report, but,

7    yes, it's a supplemental.

8        Q    But it's titled Supplemental?

9        A    Yes.

10       Q    And it was intended to address the

11   report from TransCon, correct?

12       A    That's why I called it a rebuttal

13   report, sure.  And I don't see any opinions other

14   than this new opinion of the time phasing that he's

15   trying to explain about making contact with the

16   anchor bolt and the front of the trailer making

17   contact with the now-lowered phase line, which is

18   not in any of his first report, his opinion report.

19            And the other thing about figure 6 and 7

20   is he doesn't use the right width of the trailer.

21   He uses a trailer that's only 7.9 feet wide, when

1    it's actually eight and a half feet wide.  So how

2    does that alter his animation -- I'm sorry, his

3    simulation?  I don't know.  But the vehicle that he

4    used is 7.9 feet wide, where the dimensions of the

5    trailer that was measured by an independent person

6    is obviously 8.5 feet.

7        Q    Where do you get the 7.9 feet?

8        A    From his simulation.

9        Q    I mean, where is it?  Does it say it

10   anywhere?  Where is that coming from?

11       A    Well, it doesn't say it because it would

12   have been wrong.  So he wouldn't want to say it.

13   So you have to take his actual animation in the

14   electronic form and actually measure the width of

15   it, which is what we did.  It didn't appear to be

16   the right width, so we measured it.

17            Here is a snippet of his animation

18   showing that the trailer is only 7.9 feet wide.

19       Q    What am I looking at, just for the

20   record?

21       A    Sure.  The red and green dots are the

1   measurement of the width of the trailer.  And the

2   total width of the trailer, as indicated on the

3   snippet box, is 7.9 feet, where the trailer that we

4   were told was involved in this accident was eight

5   and a half feet wide.

6         Q      Could we make a copy of this?

7         A      Sure.

8         Q      And it's okay if it's difficult to make

9   it in color.  It can be a black-and-white, but I

10  would like to make it an exhibit.  And if you don't

11  mind, can you make copies of the packet of photos

12  that we were talking about earlier?

13        A      Yes.

14        Q      And I'll review my notes.  I may just

15  have a few more, or I may be done, okay?

16        A      Sure.

17               (A recess is taken.)

18  BY MR. GIRMAN:

19        Q      Did you discuss this case with Robert

20  Simpson?

21        A      Yes.

1       Q       How many times?

2       A       I don't know.  Multiple times.

3       Q       Did you meet with him in person to

4    discuss the case?

5       A       Yes.

6       Q       You went to the scene with him, correct?

7       A       Yes.

8       Q       When's the last time you met with him to

9    discuss the case?

10      A       Well, I said hi to him downstairs, but I

11   didn't discuss the case.  Yesterday afternoon I

12   guess would be the latest.

13      Q       What did you discuss?

14      A       I don't believe we actually had a

15   conversation discussing our case or our opinions to

16   each other, although, we were with Mr. Yurcon here

17   at the conference table.  As far as what I

18   discussed with him, this is --

19              MR. YURCON:  Which I think, by the way,

20        makes it privileged under Rule 26.

21              MR. GIRMAN:  Why, because you were

1    present?

2         MR. YURCON:  Yes.

3         MR. GIRMAN:  Is it your position that

4    he's not going to be able to tell me what you

5    discussed?

6         MR. YURCON:  Yeah, I think it has to be,

7    to be consistent with the rule.  I'll object.

8    Q    When's the last time you spoke with Mr.

9    Simpson outside the presence of counsel, whether by

10   phone or in person?

11   A    I don't believe we ever spoke outside of

12   counsel.  If we did on the phone, we were in

13   conference call.  I believe so.  I can't think of

14   one.

15   Q    Okay.  Can you turn to page 19 of your

16   report?

17   A    Yes.

18   Q    The first paragraph, would you read that

19   into the record?

20   A    "The purpose of this section is to

21   evaluate the available evidence and/or lack of

1    evidence and to reconstruct this incident to

2    demonstrate the sequencing of events that caused

3    this accident."

4        Q      And did you, in fact, reconstruct this

5    accident?

6        A      Yes.

7        Q      And as a result of that reconstruction,

8    you reached conclusions in the case, correct?

9        A      Yes.

10       Q      You agree with me that at the bottom of

11   page 19 it states, "After evaluating this case, we

12   have come to the following conclusions," and then

13   you list your conclusions, 1 through 12?

14       A      Yes.

15              MR. GIRMAN:  Okay.  That's all the

16       questions I have.  Thank you.

17              THE WITNESS:  You're welcome.

18              MR. YURCON:  You have the right to read.

19              THE WITNESS:  I'm going to read.

20              MR. GIRMAN:  We're just going to attach

21       them as exhibits, and then I'll make a record.

1      He doesn't have to be present, you can be

2      here, but we're just going to identify on the

3      record what we've attached.

4           MR. YURCON:  Okay.  That's fine.

5           (A recess is taken.)

6           MR. GIRMAN:  We've marked as Exhibit 1

7      the packet of photographs that Mr. Reuschling

8      was referring to during his deposition,

9      including the WTAE video which we referred to

10     several times.

11          And then Exhibit 2 was the --

12          MR. YURCON:  The dimensions that he

13     extracted from your simulation.

14          MR. GIRMAN:  Mr. Dunn's, yeah,

15     re-creation.  It's Mr. Reuschling's dimensions

16     of the trailer that were used by Mr. Dunn, and

17     that's Exhibit 2.

18          (Reuschling Exhibits 1 and 2 are marked

19     for identification.)

20          (Discussion off the record.)

21          MR. GIRMAN:  Exhibit 1 is 20

1    photographs, a collection of 20 photographs.

2         (Signature having not been waived, the

3    deposition of GLEN F. REUSCHLING was concluded

4    at 1:00 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

CERTIFICATE OF WITNESS

I, GLEN F. REUSCHLING, have read the foregoing transcript of deposition taken on Thursday, July 25, 2013, at Annapolis, Maryland, and do hereby solemnly declare and affirm it is an accurate and complete record of my testimony given under oath in the matter of Universal Underwriters Ins. Co. vs Dedicated Logistics, Inc., et al., including any and all corrections that may appear on those pages so denoted as corrections.

_____
GLEN F. REUSCHLING

_____
DATED

1                C E R T I F I C A T E

2        I, JUDITH D. VAN VLIET, Certified Shorthand

3   Reporter and Notary Public, do hereby certify that

4   the foregoing is a true and accurate transcript of

5   my stenographic notes of the deposition of GLEN F.

6   REUSCHLING, who first duly declared and affirmed,

7   taken at the place and on the date hereinbefore set

8   forth.

9        I further certify that I am neither attorney

10  nor counsel for, nor related to or employed by any

11  of the parties to the action in which this

12  deposition was taken, nor am I financially

13  interested in this action.

14       THE FOREGOING CERTIFICATION OF THIS TRANSCRIPT

15  DOES NOT APPLY TO ANY REPRODUCTION OF THE SAME BY

16  ANY MEANS UNLESS UNDER THE DIRECT CONTROL AND/OR

17  DIRECTION OF THE CERTIFYING REPORTER.

18  _____

19  JUDITH D. VAN VLIET, C.S.R.
    CA Lic. No. 1924
    NJ Lic. No. XI00409 (inactive)
20  NH Lic. No. 121
    My Commission Expires 10/28/15
21  DATED:  July 26, 2013



A70769C
GLEN F. REUSCHLING    JULY 25, 2013

## A

**able** 29:1 35:17 37:1 41:12 65:18 81:4
**about** 5:3 11:10,17 12:12 12:13 13:15 15:2 16:7 16:10 20:13 26:16 27:3 32:19 36:15 41:20 42:14,15 46:5 47:18 50:2,7 51:8 53:20 54:16,18 58:6 58:10 61:20 62:9,16 65:8 66:12 73:13,14 74:21 75:13 77:15,19 79:12
**above** 42:3
**aboveground** 41:14
**absolutely** 19:7 26:10 33:21 35:11,14 46:16 53:5 55:19 61:3 65:18 67:2 68:7
**accident** 6:7,10,12 7:1 9:8,11,14 11:15 12:9 20:9 25:1,2,5,11,19 26:8,13 27:4,8,12 32:7 32:8 33:8,14 35:19 36:20 41:1 45:20 46:9 47:12 48:1 50:2,7 51:5 51:6,8,13 53:8 66:17 79:4 82:3,5
**accidents** 6:13 7:5,19 9:3 11:19 13:8 46:2 51:11
**accurate** 18:11 51:15,17 85:6 86:4
**accurately** 27:10
**across** 8:7 73:5
**acting** 47:3
**action** 1:5 2:5 86:11,13
**actual** 19:2 22:19 40:21 66:3 68:21 78:13
**actually** 7:8 15:15 29:14 62:2 67:18 71:5 73:12 78:1,14 80:14
**add** 36:6
**address** 77:10
**adjacent** 69:19
**affirm** 85:6
**affirmed** 5:2 86:6
**after** 5:2 8:10 25:2,3,19 27:4 31:11 32:7 48:1 51:11 55:20 56:13,14 57:5,10 82:11
**afternoon** 80:11
**again** 11:3 31:21 53:15 60:10 61:7,14
**against** 13:6,6 19:11 62:6
**ago** 10:18 16:10,13
**agree** 26:5,10,11,15 27:12,13 32:16 35:16 36:14,17 42:12 44:6 46:17 47:21 49:11 50:1 53:4,8 69:6 70:18 71:2,5,8,11,17 73:21 76:16 82:10
**ahead** 27:14,15 61:6 64:2
**al** 69:1 85:9

**alley** 24:15 52:9
**alleyway** 48:20 49:1 60:9 61:14 64:21 66:13 69:8 71:14 73:5 75:10 76:2
**allow** 70:4
**almost** 25:16 45:9 63:18 75:9
**along** 5:18
**already** 47:8
**alter** 61:13 67:4 78:2
**altered** 51:2,3
**alters** 64:19
**although** 66:17 80:16
**anchor** 37:11,16 38:4,11 38:11,13,15 39:7,7,16 39:21 40:1,9,11,15,21 41:8,11,21 42:3,13,21 43:3,9,14,21 44:4,20 46:4,10,10,17 47:5,9 47:14 48:1,2,11,11 49:1,6,13 51:19 52:1 53:9 54:1,9,12 57:6,11 58:1,11 70:7 71:19,20 71:21 72:4,10,18 73:1 73:20 74:16,17 75:2,8 76:11,18 77:16
**and/or** 4:8 39:17 81:21 86:16
**angle** 47:7,8,10 62:10
**angles** 45:2
**angular** 45:9
**animation** 73:17 78:2,13 78:17
**Annapolis** 1:15 2:17 85:5
**another** 16:6 18:6 31:15 37:21
**Anstandig** 3:14
**answer** 10:21 13:11 19:12 39:18 48:14 54:15 58:4 67:16
**answered** 24:3 75:2
**answering** 64:3
**anybody** 50:15
**anyone** 7:21
**anything** 14:16 18:19 41:18 43:3
**anything's** 57:19
**anywhere** 28:8 38:2 78:10
**apologize** 19:13 39:20 64:4 69:11
**appear** 67:14 78:15 85:10
**appears** 30:10 67:16
**APPLY** 86:15
**appreciate** 21:8
**approach** 61:14
**approximately** 37:5
**April** 8:21
**area** 10:19 26:9 34:8 40:14 42:9,11,11,15 42:19 44:21 55:10
**around** 18:1 40:19 42:18 45:7 64:7,11
**arrow** 64:12,18 65:3,14
**articulated** 49:8
**articulation** 48:20 64:20

72:20
**ascertain** 37:1
**asked** 39:19 46:9 48:9 54:17 56:13 73:13
**asking** 13:15 35:7 69:11
**aspect** 55:15
**aspects** 26:20 45:5 46:3
**associate** 45:4
**assume** 24:2
**assuming** 35:8
**assumption** 61:1
**assumptions** 61:8
**ATKINSON-BAKER** 1:18
**attach** 82:20
**attached** 4:8 31:4 47:20 83:3
**attachment** 47:18
**attempt** 34:1 56:15 58:3 58:16 66:8
**attempted** 61:17
**attempts** 63:10
**attended** 10:16 17:18
**attending** 10:9
**attorney** 15:17,17 17:4 86:9
**available** 81:21
**aware** 36:10 47:14
**axle** 37:13,14 72:17 73:1
**a.m** 1:16 2:17
**A70769C** 1:21

## B

**back** 7:8 13:1 26:13,19 26:20 27:17 28:3 29:20 30:2,15 31:4,18 32:18 33:13 34:2,11 35:9,19 36:7 41:5 44:12 48:19 49:4,18 52:6 53:16 59:11,14 60:19 61:9,9,13 63:9 64:20 66:2,2,5,9,13,15 68:13,17 69:8,9,12 76:7
**backed** 34:8 36:11,15
**bad** 21:2
**bailiwick** 58:3
**Baltimore** 7:9 13:2
**based** 36:1 42:2 59:16 60:17 61:1,8 62:4,10 62:14 63:14 65:7,10 65:15 66:8 67:6 71:18 73:17
**basically** 58:17 64:11
**bead** 38:21
**bear** 19:10
**beautiful** 16:17
**became** 9:8
**becomes** 50:20,20
**before** 2:18 5:14 8:15 25:1,4,10 69:2
**begins** 60:5,8
**behalf** 2:15
**being** 46:2,18,19 64:14 69:18 74:19 75:2
**belief** 50:19
**believe** 21:1 28:6 33:1 34:21 40:4,18 47:5,18 48:10 49:9 50:16

56:12 72:7 73:14 80:14 81:11,13
**below** 21:12 43:8
**bend** 38:11,16 40:1 46:18 47:21 48:5
**bending** 38:13
**beneath** 42:21
**bent** 46:10 48:12 49:6 54:12
**best** 64:14,14,15
**better** 66:1
**between** 23:16 39:3 61:12 76:1
**BG&E** 13:2
**birdseye** 64:9
**bit** 64:8
**black** 35:5 44:21 45:8
**black-and-white** 79:9
**body** 27:1,18
**bolt** 43:9 76:12 77:16
**both** 12:15 32:5,11,13 59:11,12 73:8
**bottom** 23:17,19,21 31:8 55:11 56:1,2 58:12 82:10
**Boulevard** 1:19
**box** 12:13 14:15 79:3
**Brand** 1:19
**brand-new** 30:13 62:1 67:1
**break** 54:4 57:15
**Brief** 17:6 21:10 34:15
**bring** 52:1
**Buerger** 8:5,6 17:12,14 18:16
**building** 48:6 49:9 62:7
**bump** 39:14
**burned** 27:1
**burning** 29:15 36:4
**burns** 31:18
**business** 11:2,3
**B-U-E-R-G-E-R** 8:5

## C

**C** 3:1 86:1,1
**CA** 86:19
**CAD** 23:12 33:15 59:11 66:7 70:10
**California** 1:19
**call** 9:12 59:9 77:5 81:13
**called** 5:15 11:19 77:12
**came** 13:9,12 14:2 42:7 52:19 53:21
**camera** 63:14 68:2,3,9 68:10
**camper** 34:7
**capture** 30:6,7 31:19 32:19 33:19 62:2,4,9 64:16
**car** 44:12 66:8,19,19
**cars** 61:9 66:6,6,7 75:12
**case** 5:10 12:20 14:1,10 14:10,19,20 15:2,4,10 15:14,18,20 16:9,11 17:1,5 18:20 19:6 37:8 49:12 55:3,15 58:3,16 70:16 79:19 80:4,9,11 80:15 82:8,11

**cases** 6:19 14:12,12 15:21
**caught** 55:2,10
**cause** 38:16 57:12
**caused** 38:11 40:1 48:5 54:8 57:14 58:7 82:2
**center** 3:7 75:10
**certainty** 45:13
**CERTIFICATE** 85:1
**CERTIFICATION** 86:14
**Certified** 86:2
**certify** 86:3,9
**CERTIFYING** 86:17
**change** 23:2 44:7
**changed** 43:12
**changing** 10:5
**charge** 8:13 17:17
**Chrysler** 1:4 2:4 8:2 17:12,20 18:17 34:4 69:7
**CIVIL** 1:5 2:5
**class** 10:17
**clear** 5:19 35:5 65:1
**close** 75:7 76:3
**closely** 67:9 75:19
**closest** 24:15 62:19 63:10
**Co** 85:8
**collection** 4:11 84:1
**college** 10:3,5,9,20
**color** 33:16 60:2 79:9
**colors** 43:12
**come** 24:20 31:9 40:6 42:17,20 82:12
**comes** 25:20
**coming** 38:15 39:21 47:1 47:1 54:9 58:12 67:21 68:8 78:10
**commencing** 2:17
**comment** 73:12
**commercial** 13:9,16 14:1,13
**Commission** 86:20
**comp** 6:17
**companies** 6:14 11:21
**company** 1:3,10 2:3,10 15:8
**comparing** 27:20
**complete** 85:7
**completely** 26:15 76:9 76:10
**component** 6:9
**compressor** 75:7 76:3
**concentrated** 10:19
**conclude** 33:9
**concluded** 84:3
**conclusion** 43:4 71:17
**conclusions** 82:8,12,13
**concrete** 50:20 51:3
**conductors** 72:16
**conference** 80:17 81:13
**confidence** 36:3
**confident** 33:12
**configuration** 62:7 72:20
**confused** 24:11
**confusing** 76:21
**connected** 47:15 49:9
**connection** 49:5
**consider** 54:14

A70769C
GLEN F. REUSCHLING     JULY 25, 2013

consistent 33:17 38:12
45:12,17 48:13,14
49:2,10 81:7
Consulting 6:6
contact 13:9,12 14:2,14
37:10,15,18,21 38:4,7
38:10,12,15,19 39:21
40:6 42:8,17,21 43:6
43:10 44:18 45:5,10
45:11,14,18 46:3,7,11
46:15 48:11 49:13
53:21 54:9 55:21
56:13,14 57:5,10,20
58:1,10,12 72:10,15
73:1,7,17,18,19 74:16
74:17,21 75:4,8 76:11
76:18 77:15,17
contacted 40:12 46:4
54:13
contacts 13:17
contained 34:17 58:20
continues 61:7
continuing 10:1
continuous 70:11 75:21
CONTROL 86:16
conversation 80:15
convoluted 58:19
copied 35:1
copies 60:2 79:11
copy 14:5 34:20 35:2
74:8 79:6
corner 55:2 72:14 73:3
73:15
correct 7:3,6 11:5,8,9,10
15:16 16:20 19:1,4,17
20:3 22:21 23:3,7 24:4
25:1,11 26:4 27:5 29:4
30:11,12 31:2,6,20
32:20 33:5,6,9 36:2,5
36:16,21 37:3,8 38:6
40:8 41:4 43:20 44:8
47:17 51:15 53:13
54:6,10 55:1,13,14,18
56:4 58:21 59:13,21
61:4 62:16,21 63:2
65:9,11 68:3 69:19,20
70:2,8,9,13,14 71:4,20
73:10 76:14 77:11
80:6 82:8
corrections 45:10,11
counsel 81:9,12 86:10
couple 59:3
course 9:1 10:11 45:18
court 1:1,18 2:1 5:11
14:21 16:19 17:9
courthouse 16:17
Crash 6:15
crashes 13:2
credits 10:4,7
criminal 11:2
critical 66:10
crown 38:18,20 39:2,6
40:6 42:19
CSI 2:16
CSR 1:20 2:19
curriculum 10:8 11:1
curriculums 10:6
curved 64:12,17,18
C.S.R 86:18

C10 18:9

D

D 1:20 2:18 4:1 15:15
86:2,18
damage 46:3
darting 15:7
data 23:12
date 19:20 45:19 86:7
DATED 85:16 86:21
David 8:5
day 19:8 32:1,8,10 51:7
days 13:1 19:8 49:19
daytime 29:13 33:19
dealership 17:20 18:2
18:17 68:19 69:15
death 6:19
decels 39:14
declare 85:6
declared 5:2 86:6
Dedicated 1:7 2:7 26:7
36:18 37:10 72:15
85:9
defendant 1:11 2:11
3:11 15:11,12,15 17:3
defendants 5:10
Defendant/Third-Party
1:8,11 2:8,11
degree 10:3,5 11:1
degrees 68:14
delay 64:4
delivery 52:9
demonstrate 82:2
denoted 85:11
department 9:13
depending 55:16
depends 47:8
depicted 62:1
deposition 1:14 2:15
5:13,13 69:2,4 76:13
83:8 84:3 85:4 86:5,12
depositions 14:6
describe 17:21
description 4:9 74:5
detail 8:14
determine 26:6,18 29:19
46:9 56:15 60:3 61:8
63:11 66:9
diagonal 45:9
diapers 51:6
difference 50:14 72:1
76:1
different 6:6 9:15 13:21
24:18 28:2 45:2,4
46:14 59:8,15,15
75:19 76:10
difficult 44:16 45:5 79:8
dimension 49:7
dimensioned 20:17
dimensions 20:18 61:10
78:4 83:12,15
DIRECT 86:16
direction 52:10,11,18
54:8,12 86:17
directly 75:10
director 17:16
disability 9:17
disagree 26:16

discarding 44:14
discolored 44:21
discoloring 43:8
discuss 79:19 80:4,9,11
80:13
discussed 80:18 81:5
discussing 66:21 80:15
Discussion 83:20
dispense 5:16
dispute 55:1,4
distance 23:16
District 1:1,2 2:1,2 5:11
Doc 1:6 2:6
Dodge 1:4 2:4 30:12
61:19,21 62:1,12
66:15 67:1
doing 46:1
done 12:2,3,5 17:20,21
49:18 79:15
door 24:15
doors 27:2,19
DOT 22:8
dots 78:21
down 35:16 39:14 45:7
55:15 60:16
downstairs 80:10
downtown 16:18
driver 39:16 48:16 49:11
60:6
drivers 50:2,7
driver's 36:6,9 60:18
61:14,16 64:19
driveway 52:9
droop 24:17
drop 60:7
duly 5:2 86:6
Dunn 73:9 83:16
Dunn's 69:1 70:15 74:15
76:13 83:14
during 9:1 29:14 30:3
32:20 33:21 36:13
83:8

E

E 3:1,1 4:1 86:1,1
each 35:9 65:19 66:8
80:16
earlier 20:18 42:18 61:20
73:2,13 79:12
Earnell 49:12 69:6
easiest 58:18
east 52:12,20 60:10
Ed 29:8
edge 39:4
education 10:20
EDWARD 3:12
edyurcon@ambylaw.c...
3:13
effort 29:19 61:8
eight 78:1 79:4
either 29:1 35:1 52:16
53:1 63:7,13 67:9 75:3
electric 11:13 12:20 13:3
54:18
electrical 11:7,20 12:10
electrician 11:11,16
electrocuted 13:13
electrocutions 12:16

electronic 78:14
elsewhere 17:21
employed 5:21 86:10
employees 7:15,17
employment 9:1
ends 58:16
engineer 11:5,7
engineering 11:2
enough 72:2
entering 71:14
entire 17:18
entities 6:7
equipment 18:7,19
equivalent 10:4 12:4,7
20:15,17
ESQ 3:4,12
et 85:9
evaluate 81:21
evaluating 82:11
even 13:1 35:4 60:14
73:11
evening 26:8
event 56:21
events 82:2
Eventually 23:11
ever 5:13 11:11,13 12:19
17:8 46:8 81:11
everything 26:17 31:15
34:1
everywhere 49:18
evidence 36:17 43:1,6
50:21 81:21 82:1
exact 20:16 26:6 35:17
61:17 65:20 73:12
exactly 21:4 25:17 38:9
44:17 51:1,9 76:4
examination 4:3 5:5
44:17
examine 40:21
examined 40:9 41:4
43:21 44:10
examining 41:13
example 12:17 22:20
34:3 60:20 72:13
examples 12:1
Excuse 34:12
executed 69:8
exemplar 18:21 19:21
21:2,3 23:15 24:5 37:2
exerted 46:19 53:20
exhibit 34:19 35:3 44:19
44:20 79:10 83:6,11
83:17,21
exhibits 4:8 82:21 83:18
exist 58:14
exists 73:6
expect 43:13 44:3,4 47:2
49:14,16
experience 50:6
expert 9:7,9,12 12:19
14:1 15:21 17:9 45:14
53:19 56:9 69:1 70:16
Expires 86:20
explain 57:9 58:18 77:15
express 74:19
expressed 76:17
extracted 83:13
extremely 73:20
eyebolt 40:13,15,17

eyelet 42:8,12,15,17,21
43:9 44:21 46:20 47:3
47:4
E-MAILED 4:8

F

F 1:14 2:15 4:2 5:1,8
84:3 85:3,13 86:1,5
facility 11:20 20:5
facing 60:10,11
fact 48:10 67:6 82:4
fair 45:15 54:5
falling 48:6
falls 49:8
familiar 69:18
far 26:9 63:16 80:17
fashion 61:11,11
fatal 12:3,11
fatals 6:17
fault 49:17,21 51:8
February 19:15 20:2
26:3 45:19 51:20
federal 5:11 14:20 22:6
feds 22:18
feel 39:6,17
feet 24:8,10,19,20 25:16
25:17,18 37:5 40:18
40:20 47:19 77:21
78:1,4,6,7,18 79:3,5
fence 66:6
fessing 51:9
few 12:1 79:15
figure 41:19,20 44:19,20
45:7 48:4 59:20 60:8
60:14,17 61:15 62:16
62:20 63:18,20 64:6,8
64:18 65:4,5 66:1,12
69:10 71:3 72:3,5,8,11
72:20 73:11,16,21
74:5,6,12,12,12,20
75:9,19,21 76:2,4,5,8
77:19
figures 58:21 59:2 60:4
60:21 70:5,12,13,19
71:7,18 72:12 74:1
FILE 1:21
filed 5:10
files 34:4
financially 86:12
find 51:14 58:9
fine 83:4
fire 28:1,4 29:14,15 30:3
31:18 32:21 33:20,21
36:4 62:1 67:1 68:21
75:14
first 13:11 14:10,19,20
28:12 37:14 39:18
46:13,16 59:5 60:6
63:9,13 72:21 77:18
81:18 86:6
five 7:16 10:18 21:15
28:12,21
five-year-old 15:6
flash 68:2,5
flashlight 68:12
Floor 1:19
following 82:12
follows 5:4

A70769C
GLEN F. REUSCHLING    JULY 25, 2013

Page 3

foot 61:18 65:19,20
force 46:18 47:1,3 53:20
   54:4,8
foregoing 85:3 86:4,14
forgive 42:10
form 32:4 35:20 78:14
forth 86:8
found 33:17
foundation 48:15
four 28:12,21
four-year-old 15:6
from 9:21 10:12 14:6
   17:8 22:20 24:6,7,20
   25:20,21 26:21 27:2,7
   30:18,19,20 31:7,10
   32:2 33:18 40:11
   41:13 43:14,15 45:14
   45:16 46:1,10,19,19
   47:1,2 52:4 56:18
   62:14 65:8 68:1,2,8,18
   70:12 77:11 78:8,10
   83:13
front 28:20 34:9 55:9
   62:11 63:6 72:14 73:3
   73:15,19 75:1,4 77:16
full 66:6
further 86:9

**G**

Gas 13:3
Gateway 3:7
getting 64:4
Girman 3:4,6 4:4 5:6,9
   24:2 29:7,9 32:9,15
   34:13,16 35:4 53:18
   79:18 80:21 81:3
   82:15,20 83:6,14,21
give 5:12 12:1 50:2
   57:11 60:1
given 5:4,13 9:10 59:17
   59:19 85:7
Glen 1:14 2:15 4:2 5:1,8
   84:3 85:3,13 86:5
Glendale 1:19
go 5:17 19:8 27:14,15
   28:5 41:15 47:2
   48:21 49:1 58:16 61:6
   64:2,3 67:11 69:21
   74:7,11
goes 13:1 60:15,17
going 5:16 8:12,13 28:1
   28:5 32:3 34:20 44:7
   52:11 53:19 54:3,7,11
   56:11 57:13 58:6,9
   68:21 73:4 81:4 82:19
   82:20 83:2
gone 24:19
gray 66:3,3
great 18:14 54:14
greater 10:18 23:5
green 78:21
Greyhound 16:9 17:1,3
ground 5:16 40:12,16
   41:3,13 42:3 47:7
guess 7:11 28:6 31:12
   33:18 34:6 36:5,7
   52:11 56:16 57:5,18
   80:12

guessing 53:1 60:10
Gulf 3:15
guy 37:11 38:1 46:10
   47:2 72:10,17 73:1

**H**

half 16:16 17:6 21:12,15
   42:15 78:1 79:5
hallway 8:7
hand 31:9,10
handing 29:18
handled 12:15 13:1,4,18
   44:11
happen 22:11
happened 27:8 44:16
   49:21 50:8,17 51:1,9
   56:9 75:11
happening 53:9
Harris 49:12 69:6 71:12
having 5:2 84:2
head 13:20 20:11 22:12
   25:14,15
height 20:19,21 21:1,3
   21:20 22:6 23:1,19
   37:2,4 54:17,18
helpful 19:7
hereinbefore 86:7
He'll 21:15
hi 80:10
high 40:16
him 49:4,14,16 80:3,6,8
   80:10,18
Hip 15:5
hit 39:16 73:15
hitting 71:21 72:3
hole 40:13
home 11:12
honestly 52:5
Hot 15:5
hung 25:3
hybrid 23:12

**I**

idea 57:14 64:15
identification 83:19
identified 31:17
identify 30:5,8 83:2
identifying 44:17
illustrate 75:20
illustrated 73:16
illustrates 73:12
illustration 23:13 74:18
   75:9
image 46:6 62:14 63:14
   63:18 64:6,6,10,15
Imaging 6:16,17 7:10
   17:14
impact 43:15
impacted 70:7 72:17
important 19:5
inactive 86:19
Inc 1:7,18 2:7 85:9
inches 37:6 42:15
incident 8:1 17:11 19:3
   21:21 41:12 43:11
   44:15 50:16 82:1
incidentally 34:18 67:13
include 59:12 72:3

included 26:21 27:17
includes 50:15
including 51:12 83:9
   85:9
inconsistent 49:3
incorporated 23:12
incorrect 15:12
independent 78:5
indicate 19:20 36:18
   38:3
indicated 79:2
indicates 38:7
individual 13:15
information 36:15 59:16
   59:19
injuries 6:19 9:21 10:2
   12:5
input 58:15
Ins 85:8
inside 26:21 27:18
inspected 19:2 44:4
   51:18
INSURANCE 1:3 2:3
intended 70:5 77:10
interested 86:13
interesting 51:10 72:2
   73:20 74:4
interpret 72:9
interpretation 74:14,15
interrupted 27:15
investigated 13:8 45:18
   46:8
investigation 6:7,10,12
   7:18 8:1 12:11,18
   17:13 27:17
investigations 6:15 12:3
   12:6,9
involve 6:19
involved 6:21 7:17,21
   15:6 19:3 20:9 21:20
   41:1,12 79:4
involving 11:19 12:20
   13:2 14:13
item 19:19
items 28:13,16,19
It'd 37:14

**J**

JAMES 3:4
January 8:20
Jeep 1:4 2:4
jgirman@pionlaw.com
   3:5
Jim 5:9 29:6 32:4 35:3
   65:4
job 9:19
Johnson 15:5
Judith 1:20 2:18 86:2,18
July 1:15 2:18 85:4
   86:21
junction 14:15
June 9:9
just 7:20 9:14 11:12 13:5
   15:13 16:7 21:18 27:3
   30:4 31:7,15 32:20
   35:5,12 38:17 39:15
   46:1 53:1 56:12 57:1
   58:1,5 60:1 61:15

62:11,15 64:12,13,17
   65:1 67:3 68:10 71:16
   76:21 77:1 78:19
   79:14 82:20 83:2
justice 11:2

**K**

keep 35:12
kid 51:4
kids 51:8
kind 58:3,16
King 1:3,4 2:3,4 8:2
   17:11,20 18:16 69:7
Kings 34:4
King's 69:15
knew 53:1
know 5:18 16:14,17
   18:15 20:10 21:4,11
   21:11,19 22:11 23:1,3
   25:19 27:6 28:13,15
   28:17 29:2,11 31:21
   32:17 33:7 34:21
   37:17 39:10 40:15
   42:16 43:1,10,12
   44:11,12,13 45:11,20
   46:6,21,21 47:9,13
   48:5,8 52:5 54:19
   55:17 57:2,10,18 58:1
   62:8,11,13 63:8,12,16
   64:13 67:3,21 68:8
   73:15 78:3 80:2
knows 13:4

**L**

lack 81:21
lane 63:11 64:13
large 42:11
laser 6:8,9,20 7:1 18:9
   23:8 59:10
last 10:16 11:3 31:8
   32:19 77:1 80:8 81:8
later 35:5 44:5,10,10
   68:20
latest 80:12
leading 72:17
least 16:12 40:15
led 47:15
left 24:15 60:9 61:16
   64:18 71:12,13
Leica 18:9
length 49:6
Less 39:18
let 5:18 29:2 72:7
let's 13:2
level 42:3
Lic 86:19,19,20
lie 50:8
lied 50:9
lift 12:17,17
lifted 13:13
light 66:3 67:21 68:2
lights 67:14
like 14:7,10,16 21:12,13
   28:7 39:14 45:17
   48:15 79:10
likely 33:7 57:2,3
limited 6:13 7:1
Limiting 12:10

line 13:10,13 14:3 23:20
   23:21 24:7,17,19 25:8
   54:19 55:3,11 56:1,2
   58:12 62:12 63:11,13
   63:13 77:17
lines 23:16,17 57:13
list 14:12,18 15:13 16:5
   82:13
listed 28:19 33:16
listen 51:11
lit 68:14
little 15:6 51:4,8,14,15
   59:8 64:8
LLC 1:4 2:4
locate 29:1 34:2
located 53:9
location 18:5,6 24:4,8,9
   24:12,16 26:11 27:11
   35:17 36:8 48:20,21
   63:17 70:6 73:4 74:13
locations 24:18 39:1
   59:15
Logistics 1:7 2:7 26:7
   36:18 37:10 72:15
   85:9
long 8:18 43:10
longer 8:8
look 16:12 20:11,12 21:4
   27:18 28:16 40:19
   42:5 45:6,7 48:9 52:2
   55:8 56:13 59:2 74:6
   74:13 75:19
looked 28:13,17
looking 14:18 19:16 27:1
   27:2 28:14,19 34:3
   41:17 46:2 48:2 60:10
   66:20 74:20 78:19
looks 14:6,9 45:17 62:18
loose 41:4
lot 13:2 26:8,13 28:3
   29:20 30:3,15 32:18
   33:13 34:2,10,11
   35:19 36:7,19 48:19
   49:4 50:1,4 59:11,14
   60:19 61:9,10,13 66:2
   66:5,5,9 69:7,9,15,19
   70:1 76:8
lower 47:19
lowering 57:12
lowest 24:1,7 73:4
lying 51:16
L-E-I-C-A 18:9

**M**

M 1:4 2:4 3:4
made 29:19 37:10,15,18
   37:21 38:3,7,19 56:14
   57:5,11,20 63:11
   73:19 74:17 75:4
make 20:6,8,13,16 34:19
   35:2,2 49:4 58:5 60:19
   64:20 76:18 79:6,8,10
   79:11 82:21
makes 74:15 76:11
   80:20
making 14:14 52:9 71:12
   75:8 77:15,16
man 12:17

## A70769C
## GLEN F. REUSCHLING    JULY 25, 2013

**management** 11:3
**mandatory** 22:4
**manner** 54:4,8 75:16
**many** 7:15,17 9:6 26:18 44:11 80:1
**mark** 45:8
**marked** 83:6,18
**marking** 45:12
**marks** 44:15 45:1,1,3
**Maryland** 1:15 2:17 8:17 9:2,11 10:14 12:5 20:5 22:20 85:5
**matter** 66:3 85:8
**Mavros** 15:17
**may** 16:5 22:19 63:4,5,7 79:14,15 85:10
**maybe** 29:7
**ma'am** 53:16
**McDyer** 3:14
**mean** 16:5 24:1,13 28:10 32:10 56:8 78:9
**meaning** 33:4 39:13 69:9
**MEANS** 86:16
**meant** 24:3
**measure** 42:6 78:14
**measured** 24:19 66:4 78:5,16
**measurement** 23:18 24:21 25:4,9,18,20,21 79:1
**measurements** 18:11 21:19 22:2 23:9,10
**measuring** 24:17
**mechanical** 11:4
**medical** 8:21
**meet** 80:3
**memorized** 21:18
**mentioned** 32:20
**mess** 60:16
**met** 80:8
**metal** 43:11
**methodology** 23:13 48:17
**Michael** 1:4 2:4
**middle** 76:6
**mind** 35:13 79:11
**mine** 76:4
**minimum** 40:5 54:18
**minute** 60:1
**misses** 71:19
**missing** 71:20
**misspoke** 32:10
**model** 18:3 20:6,8,14
**month** 25:10
**months** 44:9
**more** 57:2,3 58:17 64:8 68:15 79:15
**morning** 29:13 31:11,11 31:11 32:7 33:18 34:5 34:6
**most** 65:20 66:10
**motor** 6:13 7:5 13:16 14:2,13
**move** 57:13 68:19
**moved** 27:7,9 32:2,18 33:2,21 44:13 76:9
**movement** 26:6 36:18 70:11,19 71:6,8,9,18
**moves** 18:6 76:10

**moving** 33:18
**much** 41:13,14 42:2 44:5 44:5 54:4 68:15
**multiple** 10:2 29:19 39:1 44:13 45:2,3 46:2 48:14 51:11,11 80:2
**murder** 7:9,11
**must** 64:7
**myself** 7:20 50:15 51:12
**M.S.P** 9:19 13:1

**N**

**N** 3:1 4:1
**name** 5:7,9 16:11
**named** 62:2
**national** 22:15
**nature** 9:17
**near** 47:15 65:2,14,14
**necessarily** 27:10
**need** 6:20
**needed** 54:4
**needs** 48:21
**neither** 86:9
**Nerone** 3:6
**never** 10:7 19:1 51:2 57:15
**new** 25:3 77:14
**next** 8:10 15:14 29:13 32:1,10 34:5 35:8 55:20 56:15 57:14 60:16
**NH** 86:20
**night** 9:19 25:1 26:13 36:20 44:3 77:1
**nine** 25:16
**NJ** 86:19
**nobody** 24:21 25:4
**non-crashes** 6:18
**non-motor** 6:21
**normally** 6:18
**north** 1:19 53:9
**nose** 52:10
**Notary** 86:3
**notes** 79:14 86:5
**nothing** 33:21
**now-lowered** 55:10 77:17
**now-set** 23:16
**number** 19:19 22:19 26:12 35:18 56:16,18 58:17 73:14
**numbers** 22:14

**O**

**oath** 85:7
**object** 32:3 35:20 81:7
**obvious** 46:1
**obviously** 29:13 31:8 32:8,21 51:6 63:17 78:6
**occur** 51:13 57:5
**occurred** 56:16 57:3,4 61:10,11 76:7
**occurring** 56:21
**occurs** 51:1
**off** 20:10 22:11 34:13 40:16 51:14,15 60:7 83:20

**offer** 53:19 54:11 58:6 58:10
**offset** 48:19
**off-loaded** 24:17
**off-tracked** 71:12 75:16
**off-tracking** 75:14 76:7
**okay** 11:4,10 15:13 16:4 16:15 19:14 21:17 24:11 25:6,18 26:2 27:14 29:17 30:21 30:4 30:21 31:14,17 35:4 36:9 37:7 39:15 41:11 42:10,16,20 45:21 47:14 50:11,18 51:18 51:21 59:13,18 60:15 64:2 69:18 79:8,15 81:15 82:15 83:4
**old** 34:7
**Once** 31:21
**one** 3:7 10:7,13 11:1 13:12,20 14:4 16:3,6 18:3 20:8 28:20 29:12 29:13,17 30:1,2,13,21 31:6 33:1,4 34:1 35:12 36:2 44:2 45:6 46:13 58:17 62:19 65:7 66:14,17 68:20 69:10 70:21 72:14 73:7,12 81:14
**only** 7:4 25:8 32:4 33:4 33:19,19 34:20 36:2 39:21 56:10 60:17 65:11,15 67:10 71:8 74:21 75:21 77:21 78:18
**on-scene** 27:20,21
**operations** 17:16
**operator** 39:5
**opinion** 37:9 38:10,14 39:19,20 40:5,13 42:7 45:14 50:21 56:6,9,11 64:13,16 69:21 73:17 74:6 76:17 77:14,18
**opinions** 53:20 54:11 77:13 80:15
**opposed** 7:2
**original** 35:15
**originally** 22:18
**other** 13:11 15:20,21 18:13 23:9 25:7 31:3,4 31:6 33:11,20 45:16 46:5,8 48:13,15 50:8 65:17,19 68:15 77:13 77:19 80:16
**out** 15:7 27:1,20 28:11 32:18 41:3 52:20 58:9 66:6 76:9
**outside** 81:9,11
**over** 9:15,20 13:6,19 19:11 39:7 57:16
**overhead** 13:10,12 14:2 54:18 72:16
**owned** 11:20
**oxidation** 43:12 44:14 45:1
**oxidize** 44:7

**P**

**P** 3:1,1 15:14
**pack** 33:12
**packet** 29:18,18 34:18 79:11 83:7
**page** 4:3,9 14:19 19:16 19:19 35:9 41:19 55:5 56:17 81:15 82:11
**pages** 28:12,13,20 85:10
**painstakingly** 26:17
**panel** 37:20 38:3
**paragraph** 55:8 81:18
**parenthesis** 55:21
**parked** 26:12 35:18
**parking** 26:8,13 28:3 29:20 30:3 32:18 33:13 34:2,11 35:19 36:7,19 48:19 49:4 59:11,14 60:19 61:9 61:10,13 62:12 63:9 69:15,19 70:1 76:8
**part** 37:15,16,17,18 38:19 39:3,12 40:11 40:14,15 42:16,20 43:9 45:10 57:16 61:1 66:10 68:15
**particular** 33:7 47:9
**parties** 86:11
**parts** 60:7
**passenger** 37:9 39:6,17 48:16 60:6
**past** 63:17 73:3
**patch** 66:7
**path** 23:14 35:16 48:17 67:4 76:6
**Paul** 17:6
**pause** 17:6 21:10 34:15
**paving** 15:5,7
**pedestrian** 9:18
**pen** 31:18
**penalties** 5:3
**Penn** 12:4,7 52:4,6
**Pennsylvania** 1:2,10 2:2 2:10 3:8,11,16 5:12 12:6 16:1 22:20 54:19
**Pennsylvania's** 22:14
**people** 12:16 25:7 44:11 49:17,19 51:12 68:18
**Pepco** 13:3
**per** 33:16
**percent** 50:5,6,8
**perhaps** 17:20
**perjury** 5:3
**perpendicular** 62:8
**person** 13:12 17:17 22:1 51:2 63:15 74:20 78:5 80:3 81:10
**phase** 24:1 55:11 56:1,2 56:15,16 57:13,15 58:12 73:4,15 75:1 77:17
**phasing** 77:14
**Philadelphia** 14:19 16:10,18
**phone** 81:10,12
**photo** 63:15
**photograph** 4:12 30:18 34:5 61:21 65:7,11,15 67:7

**photographs** 4:11 31:16 34:10,17 35:6 41:16 58:20 59:5 83:7 84:1,1
**photos** 79:11
**physical** 50:21
**pickup** 5:8 30:11,12 36:4 61:19 62:1,3,18 63:3,5,8,19 64:1 65:2 66:15 67:1
**picture** 30:8,10,17 31:5 31:8,8,17 33:4 34:1 36:3 61:19 62:10
**pictures** 26:21 27:4,7,18 27:21 29:16 31:3,16 33:11 34:10 42:4 45:2 66:8
**piece** 35:9 43:11
**pinpoint** 12:21 13:20
**Pion** 3:6
**Pittsburgh** 3:8,16
**place** 15:5 65:10,12,18 66:7 86:7
**placed** 24:14 61:17 63:20 74:2,3 75:12
**placement** 24:5 48:18 49:3 60:3 65:17,20
**places** 60:8
**plaintiff** 1:5,8 2:5,8,16 3:3 15:9 17:2
**play** 17:12
**please** 5:7,18
**plow** 34:5,9 61:19 62:4 62:13 63:21 66:14,19 67:2,3,7
**plug** 59:20
**plural** 33:4
**point** 10:13 25:16 28:11 55:16 57:18,19,20
**pointing** 52:10
**points** 59:15
**pole** 1:12 14:15 26:9 44:4 47:16,16,19 48:6 49:8 53:10,21 54:5 55:3 56:3 57:15,21 58:7 62:5,6 63:10,18 **poles** 13:6,17
**police** 8:19 9:2,6,9 49:19 **position** 7:12 34:7 45:9 62:11 71:10 76:11 81:3
**positioned** 47:6 66:19
**positioning** 71:3 75:12 76:2,12
**positions** 49:2
**possibilities** 58:14
**possibility** 37:21 56:7,10 56:12,20 73:6
**possible** 26:18 34:18 35:10 39:8 57:8,8,17 57:19,21 58:2 75:3,3
**possibly** 6:18 73:8
**power** 1:10 2:10 3:11 12:4,7,13 13:10,13 14:3 52:4,7
**precluded** 17:8
**preparation** 66:13
**prepared** 37:8
**preparing** 64:20
**presence** 81:9

A70769C
GLEN F. REUSCHLING   JULY 25, 2013

present 33:13 35:18
  81:1 83:1
presently 8:6 10:9
President 7:14
pretty 66:16
prevented 9:21
previous 32:21
prior 26:9 47:12 53:8
  71:14
private 8:14
privileged 80:20
probable 57:1
probably 10:18 66:16
problem 49:17,20 51:5
procedure 48:17
produced 29:5
property 69:19
protocol 48:17
provide 35:17 59:16,17
provided 14:5
Public 86:3
pull 42:4
pulled 46:18 55:3 56:1,2
purpose 18:10,13 23:8
  81:20
purposes 53:3
put 29:16 55:18 66:7
P-E-P-C-O 13:3
P.C 3:6,14
p.m 1:16 84:4

**Q**

question 5:19 13:21
  18:14 21:2 32:4 35:15
  35:21 39:15 44:2
  53:14,17 54:14 58:4
  59:6 64:4 69:11 71:2
questions 5:17 52:18
  53:4 59:3 73:13 82:16
quibble 56:8
quibbling 42:10
quick 67:11

**R**

R 3:1 86:1
radius 67:4
reached 82:8
read 53:16,17 55:12 69:4
  76:13,21 81:18 82:18
  82:19 85:3
reader 74:19,20
reading 74:21
really 18:15 42:5,5 58:2
  58:5
rear 26:8 30:2 36:19
  61:17
reason 65:1 72:4
rebuttal 77:6,12
recall 15:3,20 16:7 17:4
received 16:6
recess 79:17 83:5
recollection 64:14
reconstruct 7:10 9:2
  51:13 82:1,4
reconstruction 7:2,4,18
  8:1 9:8 12:2 50:21
  82:7
reconstructionist 9:7,12

9:14 11:15,18
reconstructions 13:19
record 15:13 30:4 34:13
  78:20 81:19 82:21
  83:3,20 85:7
recorded 20:18
red 64:12 65:2,14 78:21
referenced 28:8
referred 41:7 58:21 83:9
referring 15:4 22:5,9
  35:6 36:9 83:8
reflect 33:12
reflecting 68:1
reflectors 67:15,15,18
regard 17:11,19
regarding 54:12
regs 22:8
regulation 22:3,5,6,12
  22:15,19 23:4 54:16
related 7:1 86:10
remember 14:4 16:21
  47:20
remembering 47:6
render 56:11
rendition 13:15 59:11
repeat 69:12
replaced 25:8
replacement 41:8
report 19:17 23:20 28:9
  28:20 29:2 31:13
  33:16 37:7 38:2,6
  41:17 55:6 56:19
  58:20 70:16,20 71:4,7
  71:16 72:5 73:14 74:7
  74:11,21 77:2,3,6,11
  77:13,18,18 81:16
REPORTED 1:20
reporter 32:6 53:17 86:3
  86:17
REPORTERS 1:18
reporter's 31:10,12
represent 5:10 27:11
representations 59:14
REPRODUCTION 86:15
requires 23:5
residue 43:14,21
response 58:14
responsibility 58:15
result 45:11 58:17 82:7
resultant 38:12
resulted 58:11
resume 10:12
retained 15:9,18 17:1
retardation 39:11
retired 8:17
retirement 8:21
Reuschling 1:14 2:15
  4:2,9 5:1,8,9 83:7,18
  84:3 85:3,13 86:6
Reuschling's 83:15
review 67:8 69:1 79:14
reviewed 61:2
reviewing 37:7
re-creation 72:11 74:1
  83:15
right 7:20 9:16 10:7
  14:10 25:2,4,6,12 26:5
  31:9 36:13 37:1,14
  39:5 47:6,18,20 53:3,6

53:12 55:9 58:15 60:1
  60:18 61:6 62:3,10,14
  62:19 63:1,5,8,16,17
  64:5,12,17,18 65:13
  65:16 67:2,4,8 68:4,6
  68:7 72:14,16 73:1,2
  76:20 77:20 78:16
  82:18
Robert 79:19
rocker 37:20 38:3
role 17:12
rolling 13:6
roof 29:15
room 50:16 75:7 76:3
row 63:9,9
rubber 43:13,21 44:6,9
rule 80:20 81:7
rules 5:17
run 9:20
running 39:6
rust 45:3
Ryder 20:5

**S**

S 3:1
same 13:5 20:8 22:17
  32:14 39:15 51:21
  61:7 62:12 64:1 86:15
saw 10:12 43:6 45:19
saying 14:9 15:15 23:4
  29:3 32:11,13 49:17
  63:3 67:17 75:15
says 55:9 72:10,13 77:2
scan 6:20 18:1,4 20:4,14
  21:5 23:8,12,12 24:6,6
  26:1 40:19 41:7,10
  59:10 66:4
scanned 4:8 18:2,16,21
  19:20 20:7 66:5
scanner 18:9
scanning 6:8,9 7:2 17:16
  17:18,19 18:7,10
scans 18:2
scenario 72:14
scene 6:15 7:2,9 19:9
  24:7 52:1 62:2 75:14
  80:6
school 8:14
screw 34:20
second 17:6 34:14 35:12
  63:9,13
secondary 55:21
section 37:18 81:20
security 8:13
see 16:3 23:13,15,16
  27:19 28:18,21 29:2,8
  29:14 31:9 32:21
  41:17 42:5 43:20 44:3
  44:4,9,19 45:8 55:9
  61:16 62:5 64:16
  65:21 66:1,2 67:7,9,10
  68:13,14 75:6 76:1
  77:13
seen 14:7 19:2,6 70:15
Self-employed 6:1
sensation 39:9
sentence 55:20
separate 30:18

sequence 57:14
sequencing 82:2
series 26:19
serious 6:19 49:19
service 54:19 55:3 72:16
set 18:1 22:18 86:7
seven-foot 47:5
seven-inch 45:8
several 83:10
shaft 40:14 45:10
Shakes 25:14
shaking 25:15
shop 27:1,18 56:3
Shorthand 86:2
show 28:3 31:4 33:12
  41:20,21 66:17 69:10
  70:6,11
showing 78:18
shown 63:4 67:14 70:19
  71:7,18 75:16
showroom/body 56:3
shows 30:1,10,21 33:4
  33:20 34:5,7,9 36:3
  46:7 64:15 72:8
side 7:10 17:15 24:15
  37:9 60:9 61:16
sidewalk 37:19 38:14,17
  38:21 39:4,16,21
Signature 84:2
similar 13:5
Simpson 57:16 79:20
  81:9
simulation 70:18 71:6
  72:21 73:18 75:20,21
  78:3,8 83:13
since 43:11
sir 5:20 7:3 11:6,9 14:8
  14:11,17 17:10 18:12
  19:18 30:9 36:12
  42:14 43:5 48:7 49:15
  53:7 54:2,21 55:7 56:5
  56:7,12 58:8 59:1,4
  61:5 62:17 64:1 70:17
sits 18:5
sitting 50:15
six 45:7
size 20:17
slightly 13:21
slows 39:14
Smith 3:6
snagged 57:17
snap 58:7
snapped 57:21
snippet 28:2 30:1,20
  31:6,10,15 66:18,20
  66:21 67:11 78:17
  79:3
snippets 28:19 27:2 28:2
  29:17 31:3 59:10,13
software 70:10
solemnly 85:6
Solution 17:15
Solutions 6:16,17
some 6:18 12:5,8,17
  27:9 39:11 43:8 45:8
  45:12 47:7 51:2 52:17
  61:11,11
somebody 21:7 52:1,4
somebody's 68:12

something 5:19 6:20
  21:13 28:7 46:15
  57:11,12,17 68:13
somewhat 12:7
somewhere 30:14 40:19
  42:18 64:11 65:14
sorry 21:14 24:8,12
  27:14,21 53:13 58:18
  60:13 62:6 64:18
  65:19 66:4 69:9 73:18
  78:2
space 18:3
specific 10:7 11:1 45:6
  49:6,7 72:21
specifically 22:15 34:3
  74:13 75:13
specify 65:16
spend 9:6
spoke 81:8,11
spot 61:17 62:12
standing 62:5,6 63:15
stands 6:5
start 40:17 50:19
started 8:15,20 35:15
starts 51:4,7,7
state 5:7 8:17,18 9:2,5,9
  9:11 10:1 12:4,8 14:20
  15:1 16:19 22:6,16,16
  22:17,17,18,18 49:19
  58:13
stated 32:6 58:14 73:2
statement 55:13,14
states 1:1 2:1 55:20
  58:13 73:11 82:11
stating 65:2 72:19
station 18:4
stations 18:1
stay 69:14
stayed 69:6
stenographic 86:5
step 58:17
still 28:1 56:20 62:5,6
  64:5 73:19 75:8 76:11
stitched 18:2
stop 5:18
stopped 52:8
store 68:18
straight 47:1,2 62:7
Street 2:16
striations 45:8
strike 29:10 56:18,21
struck 9:18 15:7 75:2,17
study 10:19
studying 10:13
subrogee 1:3 2:3
superimposing 44:14
supplemental 70:15,21
  71:4 77:3,7,8
supply 24:16
supports 43:4
supposed 63:20
sure 12:21 13:17,18 21:9
  27:9 34:13 57:20 58:6
  63:14 66:16 69:13
  77:5,13 78:21 79:7,16
SUV 52:6

**T**

A70769C
GLEN F. REUSCHLING     JULY 25, 2013

Page 6

T 86:1,1
table 80:17
tag 68:16
tags 30:13
take 7:8 18:10 19:12
  44:16 78:13
taken 2:15 25:19 26:2
  27:4,7 29:11 30:18
  31:5 32:1,7,17 34:10
  79:17 83:5 85:4 86:7
  86:12
taking 10:11 49:20 63:15
  66:19
talked 54:16 61:20 65:8
talking 12:11,12 32:19
  41:20 46:5 50:4 62:9
  62:16 66:12 68:18
  75:13 79:12
tape 41:16 42:5
telephone 47:16
tell 11:17 16:7 21:5,15
  27:16 41:12 42:2
  44:16 50:7,13 56:14
  81:4
telling 12:14
terms 23:18
terrain 70:3
testified 5:4 12:19 14:1
  14:13 15:21 36:10
  42:18 49:12 65:13
  73:2
testify 54:3,7
testifying 17:9
testimony 5:3 36:1,6,10
  48:15,16 52:20 58:6
  58:10 60:5,18 68:16
  68:17 69:2 85:7
Thank 82:16
their 50:20
thing 32:14 45:3,6 51:10
  75:18 77:19
things 9:15 13:5 45:4
  48:13,15,15
think 10:6 11:3 15:11
  16:11 19:5 20:16
  23:20 29:5 31:7 40:19
  47:19 52:12,13 54:15
  54:16,17 56:21 58:2
  60:12 69:12,14 80:19
  81:6,13
Third 1:19
though 8:9 24:21
thought 77:6
three 16:10,13 28:21
  42:15 50:5,6
through 14:7 26:7,17
  27:1,2,19 28:16 36:19
  43:12 48:21 49:2 59:2
  60:4 67:11 70:5,12
  71:10 72:12,21 74:1
  82:13
Thursday 1:15 2:18 85:4
tight 56:2
time 10:16 17:18 24:7
  27:7,12 30:17 33:8,14
  35:19 46:16 59:15
  60:16 66:16 77:14
  80:8 81:8
times 44:13 80:1,2 83:10

timing 55:16
tire 37:15,17,19 38:7,15
  38:18,19 40:12 42:7
  42:16,19,20 43:7,14
  43:17 45:15,16,16
  46:5 53:21 54:9,13
  70:7 72:10,16
tires 46:5
title 7:12 9:10
titled 77:8
today 5:12 69:2 77:1
together 18:3
told 79:4
top 20:10 22:11 23:17
  29:15 42:12 46:19
  47:16,19 55:9 56:1
  73:19
total 42:14 79:2
touching 12:16
tow 9:20,20
toward 56:3
Tower 3:15
trac 24:5
tractor 20:7 39:6 52:10
  61:16 70:6 74:13 75:6
  75:10 76:3,5,9
tractor's 39:12 76:2
tractor-trailer 18:21 19:2
  19:21 20:4 23:5,14
  24:6,12,14,16,18 26:7
  36:19 48:18 49:7 52:8
  60:4,9,21 64:7 66:11
  67:5 70:12,19 71:3,6
  71:10 76:17
tractor-trailer's 24:9
traffic 15:7
trailer 20:13,14,15,16,20
  21:3,20 23:17 37:2,10
  37:13,20 54:13,17
  55:2,10 56:1 57:20
  58:11 70:6,7 71:11,19
  72:15,17 73:3,19
  74:15 75:1,5 76:10
  77:16,20,21 78:5,18
  79:1,2,3 83:16
trailer's 21:1
trained 46:2
TransCon 2:16 6:3,4,5,6
  6:15,15,17 70:11,13 88:8
  8:16 13:4 17:14,15
  72:13 77:11
TransCon's 17:13 74:6
  74:14
transcript 85:4 86:4,14
Transportation 6:5
traverse 64:7
tread 37:18 38:20 39:3
trial 16:16
trials 14:6
trick 52:17,21
trooper 8:17 9:11 10:1
Troy 17:7
truck 9:20,20 15:8 30:11
  30:12 34:9 36:4 52:7
  61:15,21 62:1,3,8,19
  63:3,5,8,19,21 64:1,6
  64:11,16,19 65:2
  66:15,20 67:1 68:15
  72:21 75:15

trucks 13:6 30:2
true 86:4
truth 5:4 50:2,7,13 56:14
try 5:18 58:4
trying 16:11 27:16 52:15
  52:21 74:18 77:15
turn 19:19 49:5 55:5
  56:2 66:11 69:8,9
  71:13 81:15
turning 48:19 64:19 67:4
twice 36:11 47:20
two 6:6,14 16:16 28:2,17
  28:21 29:12 40:18,20
  47:19 50:4,6 61:18
  65:19,20
type 12:17 14:14 18:7
  20:15 39:11 45:12

U

under 5:2 21:11 22:3
  24:19 80:20 85:7
  86:16
understand 24:13 52:21
understanding 32:5
  49:20
Underwriters 1:3 2:3
unfortunately 66:18
unit 18:5 23:5
UNITED 1:1 2:1
Universal 1:3 2:3 85:8
University 10:13
unknown 26:14 36:8
  38:19
UNLESS 86:16
unsure 55:14
until 51:13
use 18:19 23:19 70:10
  77:20
used 20:21 33:3 78:4
  83:16
uses 77:21
using 18:8 23:15 24:6
  27:18 29:10 40:11
  41:11
utilities 12:10
utility 11:14 12:2,8,20
  14:14 25:7 47:16
  53:10,21
utilize 20:19,21 23:9
U-turn 60:19

V

van 1:20 2:18 20:15 86:2
  86:18
various 10:6,21 18:1
  26:20 34:2 45:4 46:3
  68:18
vary 22:20
vehicle 6:13 7:1,5 12:12
  12:13 13:9,14,16 14:2
  14:14 23:15 31:1 33:5
  33:8,20 41:5,6 49:8
  64:5,9 66:14,14,20,21
  67:3,7,10,13,19 68:1
  75:13,17 78:3
vehicles 11:20 22:7
  26:12,18,20 27:6,11

28:3 29:20 31:4 32:1
  32:17 33:2,3,13,16,17
  34:2 35:18 36:7 48:18
  49:4 61:13 65:18
  68:17,20
versus 15:5 45:19 63:9
vertical 68:14
very 6:18 49:10 51:10,10
  67:9,10 75:7,19 76:3
video 27:21,21 28:4,10
  28:16 29:3,11 30:1,17
  30:18,20 31:7,9,18,21
  32:6,16 33:19 36:3
  62:4,14 63:4,10 64:10
  64:17 66:18 67:9,11
  67:12,14 68:3,4,5,9,10
  83:9
videos 28:2,17 29:17
  32:5
viewer 74:19,19
Vliet 1:20 2:19 86:2,18
volumes 19:11
vs 1:6 2:6 85:8

W

Wait 53:13
waived 84:2
wall 19:11
want 35:8 52:17 58:5,9
  59:3 60:2 77:6 78:12
wasn't 48:9 52:6 56:13
way 21:5 26:6 30:7 32:17
  33:1 34:6 46:21 51:2
  58:18 59:5 63:7 67:16
  70:3 75:3,6 76:4,9
  80:19
ways 73:9
week 8:11
weeks 16:16
welcome 82:17
well 12:6,18 13:11 16:4
  22:15 24:8 25:21
  28:10 38:17 40:14
  48:10 50:13 56:20
  57:10 59:4 60:5 63:7
  64:8 65:12 66:1 72:2,9
  77:3,5 78:11 80:10
went 26:17 51:21 52:19
  57:15 60:18 80:6
were 10:12 15:9 16:21
  18:7 20:18 26:12,19
  26:20 27:4,7 32:7 33:2
  33:13 34:10 35:6,18
  37:1 41:12 44:15 46:9
  60:7 63:11 64:2 68:17
  74:11 75:13 79:4,12
  80:16,21 81:12 83:16
weren't 52:21
west 2:16 52:13,14,19
  53:4 60:11,12
Western 1:2 2:2 5:11
we're 14:18 21:8 28:14
  32:11,13,19 35:5 46:5
  48:2 51:7 62:9 66:12
  66:15,21 82:20 83:2
we've 12:3,5,9,15 13:4
  13:17 65:8 83:3,6
whatsoever 76:8

When's 80:8 81:8
while 9:18,19 13:13
  14:18 19:12 21:7 28:1
  28:4 36:4
white 35:5 62:3,18 63:5
  63:19 64:6 66:15
whole 69:4
wide 77:21 78:1,4,18
  79:5
width 48:20 77:20 78:14
  78:16 79:1,2
windows 27:1,19
Winslow 3:6
wire 14:15 25:3 37:11
  38:1 46:10 47:2,15
  57:18 72:10,17 73:1
wires 12:16 73:4,8
witness 4:2 32:11,13
  35:7 51:12 74:10
  82:17,19 85:1
wood 34:8
wooden 53:10
woods 34:8
word 33:3
words 33:20
work 6:2,16 8:8,18 11:17
  12:2
worked 9:5 11:11,13
  12:9
working 8:10 9:19
workmen's 6:17
world 17:15
wouldn't 23:2 27:10 44:9
  57:4 68:5 78:12
writing 60:15
wrong 15:15 16:5 78:12
wrote 56:4
WTAE 28:6 29:3,11
  30:19 32:16 36:3 63:4
  65:8 83:9

X

X 4:1
XI00409 86:19

Y

yeah 15:11 29:7 32:9,13
  46:14 58:5 59:7 81:6
  83:14
year 44:10
years 9:5,6,15 10:18
  16:10,13 49:18
Yesterday 80:11
Yurcon 3:12,14 14:5
  23:21 29:5 32:3,12
  34:12 35:2,20 52:14
  52:19 53:14 60:11
  65:4 74:8 80:16,19
  81:2,6 82:18 83:4,12

0

09-004 15:4

1

1 4:11 19:16 82:13 83:6
  83:18,21
1st 8:21

A70769C
GLEN F. REUSCHLING    JULY 25, 2013

**1:00** 1:16 84:4
**10** 41:19 44:19,20 45:7
   48:4
**10/28/15** 86:20
**11** 9:5 41:20 55:8 56:16
   56:18 58:17 73:14
**11:00** 1:16 2:17
**12** 19:10 60:8 64:18
   82:13
**121** 86:20
**13** 21:12,14 60:21
**13-feet-four-inches** 37:6
**13-feet-six-inches** 23:6
**13-003** 31:18 65:8 67:7
**13-003WTAE** 30:5 62:2
**13-14** 60:17
**13-5** 21:15
**13-6** 21:11 22:3
**13-7** 21:12
**13.302** 37:5
**13.4** 37:6
**1300** 3:15
**133** 10:6
**14** 60:21
**1400** 13:19
**15** 36:7 61:10
**15-feet-nine-inches**
   25:13
**15.9** 24:8,9,19,20 25:16
   25:18
**1500** 3:7
**1509** 2:16
**15219** 3:16
**15222** 3:8
**16** 25:17 61:10
**17** 61:11
**18** 61:11,12,15 62:16
   63:18,20
**19** 59:2 60:4 61:12 64:3
   64:6 66:1,12 69:10
   70:12 81:15 82:11
**1924** 1:20 2:19 86:19
**1982** 8:20
**1984** 9:9
**1993** 8:21

---
**2**

**2** 4:12 19:19 83:11,17,18
**2:11-CV-01153-BNF** 1:7
   2:7
**20** 4:11 36:7 64:8 65:5
   66:12 83:21 84:1
**2006** 14:6,9,10
**2012** 14:7 19:15
**2013** 1:15 2:18 19:15
   20:2 26:3 85:5 86:21
**21** 55:5 56:17 59:2 60:4
   70:12
**21401** 2:17
**22** 41:19 70:5,13 72:12
   74:1,12 75:6 76:4
**23** 74:12
**24** 74:12
**25** 1:15 2:18 74:12 85:5
**26** 74:12 80:20 86:21
**26th** 20:2
**28th** 19:15 51:20

---
**3**

**3D** 6:8,20 59:10
**31** 49:18
**32** 70:5,13 72:12 74:1

---
**4**

**4** 70:19 71:3,7,18
**412)281-2288** 3:9
**412)765-3700** 3:17

---
**5**

**5** 4:4 70:20 71:4,7,18
**5.19.11DSCF7838** 34:4
**500** 1:19
**551-7300** 1:20

---
**6**

**6** 19:19 70:20 71:4,7,19
   76:1,2,8 77:19
**67** 28:13

---
**7**

**7** 72:3,5,8,11,20 73:11
   73:16,21 74:5,6 75:9
   75:19 76:5 77:19
**7.9** 77:21 78:4,7,18 79:3

---
**8**

**8.5** 78:6
**818** 1:20
**84** 4:11,12

---
**9**

**90** 68:14
**91203** 1:19
**97** 50:8









































