**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNIVERSAL UNDERSWRITERS | ) | |
| INSURANCE COMPANY as | ) | |
| Subrogee of KING CHRYSLER JEEP | ) | |
| DODGE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 11-1153 |
| | ) | |
| v. | ) | Hon. Nora Barry Fischer |
| | ) | |
| DEDICATED LOGISTICS, INC., | ) | |
| | ) | |
| Defendant/ Cross Claimant/ | ) | |
| Counterclaim Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PENNSYLVANIA POWER COMPANY, | ) | |
| | ) | |
| Defendant/ Cross Claimant/ | ) | |
| Counterclaimant. | ) | |

## MEMORANDUM OPINION

### I.     Introduction

This civil action arises from a fire which occurred on May 19, 2011 at the dealership site

of King Chrysler Jeep Dodge ("King") in New Castle, Pennsylvania.  King's insurance carrier,

Universal Underwriters Insurance Company ("Universal"), paid King's claim for property

damage and then brought this subrogation action against Dedicated Logistics, Inc. ("Dedicated")

and Pennsylvania Power Company ("Penn Power"), the two parties potentially responsible for

the fire.  Dedicated and Penn Power, in turn, asserted claims against each other.

During the course of this litigation, Universal entered into a settlement agreement with

Dedicated, pursuant to which Dedicated agreed to pay $400,000 to resolve the claims brought

against it by Universal, and Universal executed a release that ostensibly reserved Dedicated's

rights to pursue its claims against Penn Power. At this procedural juncture, Dedicated and Penn Power are the only remaining parties to the litigation. Dedicated has asserted a cross-claim for contribution against Penn Power, and Penn Power has asserted cross-claims against Dedicated for contribution and/or indemnity as well as a counterclaim based on Dedicated's alleged negligence in causing damage to Penn Power's utility equipment.

Presently pending before the Court are several motions relating to various evidentiary issues. Dedicated has filed a motion to dismiss and/or for a negative inference based on Penn Power's alleged spoliation of certain utility equipment (ECF No. 95). Penn Power, in turn, has filed its own motion for sanctions based on Dedicated's alleged spoliation of evidence relating to the tractor-trailer that was involved in the underlying accident (ECF No. 97). Finally, Dedicated has filed a motion to exclude the opinion testimony of Penn Power's experts (ECF No. 93). For the reasons that follow, these various motions will be denied.

II. **Dedicated's Motion for Spoliation Sanctions**

A. Background Facts

In the early morning hours of May 19, 2011, Dedicated's employee, Earnell Harris, drove one of Dedicated's tractor-trailers onto the grounds of the King dealership for the purpose of making a delivery. Also present in the vehicle was another Dedicated employee, Tom Lirette, who was being trained by Harris. Dedicated's tractor-trailer entered the grounds of the dealership via an alleyway over which various utility wires owned and maintained by Penn Power were hung. After completing his delivery, Harris attempted to exit King's parking lot via the same alleyway from which he had entered the dealership grounds. Factually, there is no dispute that, on its way out of the parking lot, the tractor-trailer struck the overhead wires, which resulted in Penn Power's utility pole breaking and falling onto the auto body shop building on

King's property.   The parties agree that, when the utility pole fell, the transformers attached to the pole broke off of the pole, fell onto the auto body shop, and ignited the fire.

What is principally disputed is the precise part(s) of the utility equipment that Dedicated's tractor-trailer first made contact with and the manner in which the contact occurred. Dedicated maintains that the first contact occurred when the top right corner of the trailer snagged an overhead service wire that was connected from the utility pole behind the body shop to an adjacent building, traversing the alleyway in question.  According to Dedicated, this wire had been negligently maintained by Penn Power in that it hung below the required clearance of 16 feet, causing Dedicated's truck to strike the wire and pull down the utility pole.  Penn Power, on the other hand, contends that the first contact occurred when the trailer's first-axle right-side tire made contact with the guy wire anchoring system that secured the utility pole.  According to Penn Power, this contact caused the utility pole to tilt and the service wires to hang below the required clearance distance, resulting in the trailer snagging the wires when it attempted to exit King's parking lot via the alleyway.

Following the accident, William Glenn, Jr., the supervisor of Penn Power's New Castle line shop, arrived on scene to oversee remediation and repairs to Penn Power's electrical equipment.  (Glenn Depo. 35-37, ECF No. 95-1.)  During the course of these repairs, Glenn observed damage to a guy wire and guy wire anchor that had previously supported the utility pole in question.  (Id. at 58-59, 79-81, 157.)  The pole itself had fractured and sustained fire damage after falling onto the auto body shop.  (Id. at 47, 71; Depo. Ex. 3.)  Glenn and another crew member made the decision to preserve the damaged guy wire and anchor, but they made no arrangements to preserve the pole, the service wire which had been snagged on the tractor-trailer, or the remaining guy wires or anchors.  (Id. at 82-84, 157.)

That same morning, James Haberkorn, Dedicated's safety director, contacted the company's insurance carrier, CNA, and made arrangements for an independent claims adjuster – Chris McDermott of Crawford and Company – to adjust the loss. McDermott arrived at the scene of the accident at around 11:30 a.m. and received initial reports from dealership personnel (who did not witness the accident) that Dedicated's driver had struck a guy wire on the utility pole. (McDermott Depo. 12-14, 20, 39-40, ECF No. 95-4.)

While he was on scene, McDermott took numerous photographs to document the damage, but he could not inspect the pole up close because a Penn Power crew was conducting work on it, and McDermott did not consider the situation safe. He was able to view the pole from a distance of approximately 15 feet and took photographs of the pole, which was rather charred and broken at the base. McDermott did not ask Penn Power's crew to preserve the pole, nor did he make efforts to inspect the pole after the crew finished their work. (McDermott Depo. at 20-22, 42-45, 48.)

Five days later, on May 24, 2011, Haberkorn emailed a diagram depicting the accident scene to Jack Donovan, a representative from CNA's major case unit. In relevant part, Haberkorn's email related that Harris "came in off Wilmington Road, proceeded between two of the buildings, made the delivery, continued forward, turned around by going to the right side of the rear of the property and then a left turn back into the driveway, striking a guide wire leading to a power pole." (Haberkorn Depo. Ex. 5, ECF No. 95-3 at 132.) Later that same day, Haberkorn sent a follow-up email to Donovan, stating that he had "[t]alked to Harris again" and that Harris "believes he hit the wires NOT the guide wire coming off the pole." (Haberkorn Depo. Ex. 6, ECF No. 95-3 at 133.)

On May 26, Donovan emailed Haberkorn and McDermott advising them to identify the power company, photograph the pole in question, and identify the pole. (McDermott Depo. Ex. 6, ECF No. 95-4 at 237.) The following day, Haberkorn forwarded to Donovan and McDermott an image of the utility pole that he had obtained from a TV news report covering the fire. Haberkorn noted in his email: "This pole in question appears rotted out on the bottom. Is the pole still available? If not, do we have a spoliation issue here?" (Haberkorn Depo. Ex. 7, ECF No. 95-3 at 134.)

On May 29, 2011, McDermott returned to the King Dealership site in an attempt to measure the height of the utility wires that Penn Power had installed to replace the ones brought down by Dedicated's delivery truck. While he was at the site, McDermott looked around to see if there was any sign of the damaged utility pole, but he found none. McDermott reported this to Donovan and Haberkorn the next day, noting that Penn Power was the company that had responded to service the damaged utility equipment. (McDermott Depo. Ex. 6, ECF No. 95-4 at 235.) In reply, Donovan instructed McDermott to photograph and measure the height of the subject tractor-trailer and contact Penn Power so that the pole could be located and identified. Donovan further instructed McDermott to advise Penn Power "in writing not to destroy the pole." (McDermott Depo. Ex. 6, ECF. No. 95-4 at 234.)

On June 1, 2011, McDermott enlisted another Crawford adjuster, Mark Kepin, to assist on the claim. Among other things, Kepin was asked to put Penn Power on notice of Dedicated's defense concerning the height of the service wires and request preservation of the utility equipment in question. To that end, Kepins contacted Penn Power on Friday, June 3 and left a voice-mail message for Penn Power representative Nancy Frasco requesting that the damaged utility pole be preserved. (Kepins Depo. 13-15, 19-21, ECF No. 95-5.)

The following Monday, after placing a second call to Penn Power, Kepins was contacted by Frasco and Flora Canty, a senior claims processor for Penn Power. Canty advised Kepins that the damaged anchor and guy wire had been preserved, but she thought the pole might have been disposed of. Canty informed Kepins that she would check with the line supervisor about the utility pole and other equipment. (Kepins Depo. at 21-23, ECF No. 95-5; Canty Depo. at 15-18, ECF No. 95-2.)

Kepins proceeded to send Penn Power a formal letter on June 7, 2011 requesting preservation of the utility pole and other equipment. After consulting with Glenn on the matter, Canty emailed Kepins on June 10, 2011 and confirmed that the damaged pole had been sawed into 5-foot sections, placed into the company's scrap bin, and hauled away by Waste Management. The other wires had similarly been scrapped, and the transformers had been shipped to Ravenna. (Kepins Depo. at 24, 54; Canty Depo. at 18-20, 44.)

Glenn claims that he made the decision to keep the anchor and guy wire because they were damaged; "some force pulled them out of the ground" and "[he had been] told that a truck had come through there." (Glenn Depo. 83:16-23, 84:4-5, 157:17-21, ECF No. 95-1.) He did not preserve any of the other utility equipment because, in his opinion, "[n]othing else there was relevant to anything." (*Id.* at 83:18.) With respect to the utility pole in particular, Glenn did not see any need to keep it because it was "[j]ust another broken pole." (*Id.* at 158:10-13.) Glenn could not recall any other occasion where he had responded to an incident involving a broken pole and had decided to preserve the pole. (*Id.* at 158:14-17.) He recalled approximately two or three previous occasions where he had preserved a guy wire and anchor, and he explained that "[t]his [was] kind of an unordinary incident, … [b]ut for the poles, .. if we kept every pole that

got broke off, we'd have more broken poles than we have new poles, and we only have so much room to keep what we got." (*Id.* at 158:23-159:4.)

B. <u>Discussion</u>

Dedicated's motion is predicated on the theory that Penn Power committed spoliation of evidence by failing to preserve the broken utility pole and remaining wires which, it argues, is relevant to its claim that Penn Power improperly constructed, maintained, and inspected the utility equipment located at the King dealership. Both of Dedicated's experts have testified that an inspection of the pole would have aided their analyses of the accident. Dedicated argues that Penn Power was aware of the potential for poles to rot or become defective due to increasing age and deterioration, and Penn Power was further aware of the need to preserve relevant evidence, as is evidenced by Glenn's preservation of the damaged guy wire and anchor. Dedicated maintains that, by preserving only the evidence that supports its theory of liability while discarding other relevant evidence, Penn Power has demonstrated bad faith suppression of evidence justifying an inference of spoliation.

Penn Power contends that the facts at issue here do not give rise to actionable spoliation. According to Penn Power, the decision to save only the damaged guy wire and anchor was based on a general perception in the immediate aftermath of the fire that the accident had been caused by Dedicated's tractor-trailer running over the guy wire securing the utility pole. Seeing no need to preserve the damaged pole, the company simply disposed of it in accordance with its normal practice. Penn Power further maintains there is no support for the theory that rot inside the pole caused the accident, nor is there any evidence to suggest that the pole would have been found to be outside acceptable safety standards.

"'Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *Swindell Dressler Int'l Co. v. Travelers Cas. and Surety Co.,* 827 F. Supp. 2d 498, 505 (W.D. Pa. 2011) (quoting *Victor v. Lawler*, Civil Action No. 3:08-cv-1374, 2011 WL 4753527, *1 (M.D. Pa. Oct. 7, 2011)). In order for spoliation to be established, it must be shown that: (1) the evidence was in the party's control; (2) the evidence is relevant to the claims or defenses in the case; (3) there has been actual suppression or withholding of evidence; and (4) the duty to preserve the evidence was reasonably foreseeable to the party. *Bull v. United Parcel Serv., Inc.,* 665 F.3d 68, 73 (3d Cir. 2012) (citation omitted). The party who seeks a spoliation sanction bears the burden of proving these factors. *See McCann v. Kennedy Univ. Hosp.*, Civ. No. 12–1535, 2013 WL 282396, at *4 (D.N.J. Jan. 24, 2014); *Stream Cos., Inc. v. Windward Adver.*, Civil Action No. 12–cv–4549, 2013 WL 3761281, at *2 (E.D. Pa. July 17, 2013) *(citing Williams v. Klem*, No. 07–1044, 2010 WL 3812350, at *2 (M.D. Pa. Sept. 22, 2010)).

If it is determined that spoliation of evidence has occurred, the Court must determine an appropriate sanction. Three key factors must be considered in this regard, namely: (i) the degree of fault of the party who altered or destroyed the evidence; (ii) the degree of prejudice suffered by the opposing party; and (iii) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future. *Schmid v. Milwaukee Elec. Tool Corp*., 13 F.3d 76, 79 (3d Cir. 1994). *See also Bull,* 665 F.3d at 74 n. 5 (quoting *Schmid*). When appropriate, a court may impose any potential sanction including dismissal of a claim or granting judgment in favor of a prejudiced party, suppression of evidence, an adverse inference (referred to as the

spoliation inference), fines, and attorneys' fees and costs. *Swindell Dressler Int'l Co.,* 827 F. Supp. 2d at 507 (citing *Victor v. Lawler,* 2011 WL 4753527, at *2).

In this case, after considering the evidence of record and the parties' respective arguments, the Court finds that no inference of spoliation is warranted based on Penn Power's failure to preserve the utility pole or other equipment involved in the May 19, 2011 incident inasmuch as Dedicated has failed to satisfy its burden of proving actual suppression of the evidence in question. With respect to this factor, the Third Circuit has clarified that a court must determine that the relevant actor suppressed or withheld the evidence in bad faith. *Bull*, 665 F.3d at 79; *see also Brewer v. Quaker State Oil Refining Corp*., 72 F.3d 326, 334 (3d Cir.1995) ("No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for."); 29 Am.Jur.2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoliation or destruction was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent."). A finding of bad faith is therefore "pivotal" to a spoliation determination. *Bull,* 665 F.3d at 79. *See id.* ("[W]e must be convinced that the District Court, on sufficient evidence, found that Bull intended to actually withhold the original documents from UPS before we can conclude that sanctionable spoliation occurred.").

Based on the evidence presented, the Court is not persuaded that Penn Power acted to suppress relevant evidence in bad faith. For one, the Court finds that the evidentiary relevance of the pole and the foreseeability of the need to preserve it for subsequent litigation purposes would not necessarily have been obvious to Glenn or the other Penn Power crew members because, initially, the focus of the accident was on whether the tractor-trailer had made contact with the

guy wire, damaging the wire and pulling its anchor out of the ground. Glenn testified to the fact that, after arriving on scene on the morning of May 19, he observed the guy wire and damaged anchor lying in the direction of the parking lot, to the rear of the dealership. (Glenn Depo. 59:16-60:1.) Glenn concluded, "[b]eing that there was nothing downstream, no trees, no car poles, anything like that, something came through; something happened to that anchor to rip that anchor out of the ground." (*Id*. at 58:24-59:3.) Glenn therefore viewed the anchor and guy wire as "relevant" evidence and endeavored to preserve those items. McDermott similarly testified that, on the morning of the accident, it was being reported by dealership personnel that the tractor-trailer had apparently struck a guy wire supporting the subject pole. This theory is reflected in Haberkorn's May 24, 2011 email to Donovan in which he reported that the vehicle "…turned around by going to the right side of the rear of the property and then a left turn back into the driveway striking a guide wire leading to a power pole."[1] Thus, in the days immediately following the fire, the focus was not on the pre-accident condition of the utility pole, but on the possibility that the tractor-trailer had struck a guy wire, causing the utility pole to shift and the overhead wires to catch on Dedicated's delivery truck. In fact, it was not until May 27 that Haberkorn first questioned the integrity of the utility pole based on a picture he had seen, and Dedicated did not formally request preservation of the pole until June 3, 2011, some two weeks after the accident.

The Court recognizes that Dedicated believes that the pole was rotted, and Dedicated might therefore argue that the pole's evidentiary value should have been apparent to Penn Power's agents. However, the evidence on this point is disputed. Glenn testified that he was able to observe the base of the broken utility pole on the morning of the fire and found no rot to

---

[1] Although Haberkorn changed his mind about the cause of the accident after talking to Harris later that day, Penn Power was not privy to Harris's account of the accident as of May 24.

be present.  Further, Glenn further testified that Penn Power has a system for inspecting its utility poles and for reporting and remediating any defects; therefore, if the pole was in fact structurally unsound, there should be a record of someone having reported the problem.  To the extent there is a factual dispute about the presence of rot in the pole, this can be addressed at time of trial.  For present purposes, however, the Court accepts Penn Power's representation that it did not preserve the pole because it did not perceive that the pole had any particular significance from an evidentiary standpoint.

In addition, the Court finds that the actions of Penn Power's agents do not suggest a fraudulent intent to suppress relevant evidence.  There is no claim here that Penn Power's agents ever took actions to limit third-party access to the pole, other than for reasons of safety while crew members were working on the pole and remediating the damage on site.  Although McDermott testified that Penn Power's crew members were working on or around the pole on the morning of May 19, preventing him from getting closer than fifteen feet, it is undisputed that McDermott never asked for permission to inspect the pole, nor did he inquire of the crew when their work would cease.  As noted, no agent of Dedicated ever requested preservation of the pole until Friday, June 3.

Once a request was made for preservation of the utility pole, Penn Power conducted a timely investigation.  After checking with Glenn, Canty reported to Kepins that the badly damaged pole had been disposed of in the company's trash bin.  Thus, the evidence suggests that Penn Power's agents simply disposed of the pole in accordance with the company's normal practices because they did not perceive that the broken pole had any particular relevance for litigation purposes and because they had not received a request for the pole's preservation prior to the time that it was lost.  At most, Penn Power's actions may be negligent, but they do not

bespeak a fraudulent intent.  *See Bozic v. City of Washington, Pa.,* 912 F. Supp. 2d 257, 270 (W.D. Pa. 2012) (noting that "[a]lmost all of the district court cases applying *Bull…* have declined to find spoliation where the party's conduct was no worse than negligent, or where the evidence was lost in the normal course of daily business or other similar activity) (citing cases).

Under these circumstances, the Court finds that no inference of actual suppression or fraudulent intent is warranted.  *See Bull,* 665 F.3d at 74 (In making a determination as to whether an actual suppression of evidence has occurred, the court has the discretion to draw inferences from the factual record developed during the discovery process).  Accordingly, Dedicated's motion for spoliation sanctions will be denied.

## III.     Penn Power's Motion for Sanctions

Penn Power's motion for sanctions is based on Dedicated's failure to quarantine the subject tractor-trailer or, at the very least, photograph the vehicle so as to document its condition immediately following the May 19, 2011 incident.  Had the tractor-trailer been preserved in its post-accident state, Penn Power argues, an inspection might have revealed physical evidence supportive of Penn Power's defense in this matter.  In particular, Penn Power asserts that evidence as to whether the initial contact point was high on the tractor-trailer or whether there were signs of contact with the guy wire is critical in this case; yet, despite his awareness of the concept of spoliation, Haberkorn made the decision to place the tractor-trailer back into service without documenting its post-accident condition.  Moreover, no representative of Dedicated or its insurance carrier inspected the tractor-trailer or looked at photographs of the vehicle prior to Dedicated making its liability determination, and Haberkorn himself did not personally inspect the tractor-trailer until the week of his deposition on August 17, 2012.  Under these circumstances, Penn Power argues, the Court should assume that the physical evidence on the

tractor-trailer did not support Dedicated's theory of liability, and the vehicle was placed back into service by Dedicated in bad faith.

Having fully considered Penn Power's arguments in light of the evidence in the record, the Court declines to draw an inference of spoliation because it finds, once again, that there has been a failure of proof relative to the issue of actual suppression. Penn Power makes much of Haberkorn's statement during his deposition that he is aware of the term "spoliation" due to his having been "burned a number of times in past life" when investigating crashes. (Haberkorn Depo. 71:3-4, ECF No. 95-3.) Haberkorn acknowledged that "in the past, when [he's] been investigating crashes, [he] was required to hang onto a tractor or trailer for whatever time it was because, if [he] didn't do that, [he] would be accused of spoliation." (*Id*. at 71:14-17.) When asked whether he had "[hung] onto the tractor or the trailer involved with this accident," Haberkorn replied, "Sure. Yes." (*Id*. at 71:20.) Haberkorn then acknowledged that the tractor and trailer were never taken out of use, nor was their condition documented by anyone prior to their being returned to service. (*Id*. at 71:21-72:18.)

Although Penn Power cites this testimony as evidencing Haberkorn's "sophisticated knowledge of the concept of spoliation," (*see* Penn Power's Br. Supp. Mot. Sanctions 9, ECF No. 98), the Court is not persuaded that the testimony necessarily supports a finding of bad faith. Rather, a fair reading of Haberkorn's testimony shows that, while he was generally aware of his duty to preserve relevant evidence, he believed he had met that duty by maintaining control of the subject vehicle and making it available upon request to Penn Power and its attorneys. At most, the evidence may support a finding of negligence on the part of Haberkorn, but it is insufficient to persuade this Court that Haberkorn acted in bad faith on behalf of Dedicated to intentionally suppress relevant evidence.

In addition, there appears to be no dispute about the fact that Dedicated returned the tractor-trailer to service before any of its own representatives had an opportunity to inspect the vehicle. Consequently, to the extent there was physical evidence on the vehicle that was supportive of Dedicated's theory, Dedicated has lost the opportunity to benefit from such evidence. This fact lends support to the Court's conclusion that Dedicated's actions in regards to the tractor-trailer do not reflect bad faith.

Finally, the Court is not persuaded that Penn Power has been unfairly prejudiced by the loss of relevant evidence due to Dedicated's actions vis-à-vis the subject tractor-trailer. At this juncture, it appears that Penn Power has not found evidence on the vehicle to confirm its theory that the vehicle's tire struck the damaged guy wire. Penn Power contends that such evidence may have existed at one time and been lost to natural wear and tear on the vehicle, routine cleaning and maintenance, or weathering. This theory is somewhat speculative but, regardless, Penn Power will have the opportunity to present this argument at time of trial so as to account for the lack of physical evidence on the truck.

Based on all the foregoing considerations, the Court finds that Penn Power has not proved actual suppression of evidence on the part of Dedicated. Penn Power's motion for spoliation sanctions will therefore be denied.

## IV. Dedicated's Motion to Exclude the Opinion Testimony of Penn Power's Expert Witnesses

Also pending before the Court is Dedicated's motion to exclude the opinion testimony of Glen F. Reuschling and Robert A. Simpson, Penn Power's expert witnesses (ECF No. 93). In support of its motion, Dedicated has filed a brief and numerous exhibits (ECF No. 94; ECF No. 93-1through 93-8). Penn Power has filed a brief and exhibits in opposition to Dedicated's

motion (ECF No. 101), and Dedicated has filed its sur-reply brief (ECF No. 103). Accordingly, the matter is now ripe for disposition.

A. Background Facts

   1. *The Opinions of Glen A. Reuschling*

Glen F. Reuschling, a former state trooper and accident reconstructionist, is the president of TransCon CSI, a business engaged in laser scanning and accident reconstruction. (Reuschling Depo. 6-9, ECF No. 93-5.) Reuschling has offered opinion testimony on behalf of Penn Power concerning the movement of the tractor-trailer driven by Harris and the manner in which it first made contact with Penn Power's utility equipment. In relevant part, Reuschling has concluded that, while attempting to exit the dealership via the alleyway, the tractor-trailer experienced a right-sided-off-tracking event, during which the first-axle tire on the right side of the trailer "tracked" inside the tractor as the vehicle made a right-hand turn into the alleyway, making contact with the guy wire anchor positioning system that secured the subject utility pole. (Reuschling Expert Report at 21, 41, ECF No. 93-4.)

In his report of April 29, 2013, Reuschling sets forth the methodology he used in arriving at his conclusions. Among other things, TransCon conducted numerous high definition laser scans of the dealership site for the purpose of constructing an accurate 3-D computerized depiction of the accident scene and surrounding environs, including the topography, building structures, power lines, and utility poles. (Reuschling Report at 1, 8-9.) In addition, TransCon obtained a high definition 3D laser scan of an exemplar tractor-trailer similar to the one driven by Harris in order to capture the vehicle's dimensions. (Id. at 9.) The tractor-trailer images were then integrated into the 3D model of the dealership site to illustrate Reuschling's theory as to the path that the tractor-trailer traveled and the manner in which it made contact with the utility pole

15

guy wire. (Id. at 9 and 23-40, Figures 12-32.) In developing his theory, Reuschling analyzed 67 items of evidence, including investigative materials compiled by King, its insurer, the responding fire and police departments, and Penn Power. (Reuschling Report at 1-5.) These extensive materials included (among other things) Harris's and Lirette's accounts of the event, numerous photographs of the accident scene, and documentation of the bent steel guy wire anchor that was apparently pulled from the ground – evidence that Reuschling found consistent with impact from the trailer's tire. (Id. at 1-5, 22, 41.)

2. *The Opinions of Robert A. Simpson*

Robert A. Simpson has been retained by Penn Power to testify as an expert in field of utility operations. In his report, Simpson concludes, in relevant part, that:

- the principal cause of the fire was Harris hitting the guy wire anchor on Penn Power's utility pole while attempting to return to the alley from the rear parking lot;

- the condition of the bent guy wire anchor, including the presence of scrape marks on the above-ground section as well as 19-inches of bending and approximately 28-inches of exposed anchor pulled from the earth, could not have been caused simply by the pole falling; and

- the striking of the anchor rod by Dedicated's delivery truck tilted the pole toward the body shop, thereby lowering the Penn Power's service wires to a height that enabled contact between the top corner of the passenger side of the trailer and the service cables and breaking the pole.

(Simpson Expert Report at 15-16, ECF No. 93-7.) Simpson based these conclusions on, among other things, his inspection of numerous court documents filed in this case, photographs of the accident scene, an inspection of the accident site, an examination of the recovered guy wire and anchor, and a review of the deposition testimony. (Id. at 2-13.)

### 3. The Opinions of Ashley Dunn

Dedicated has retained the services of Scientific Expert Analysis, Ltd. ("S-E-A") to investigate and analyze the events leading to the May 19, 2011 fire. S-E-A has concluded, among other things, that the accident resulted from one or more of Penn Power's conductors being positioned at a height below that required by the National Electrical Safety Code, thereby allowing contact to occur between the conductor(s) and Dedicated's tractor-trailer. (S-E-A Report of 4/30/13 at 1, ECF No. 95-8.)

Ashley L. Dunn, Ph.D., P.E., is a project engineer employed by S-E-A who assisted in the investigation and helped prepare S-E-A's initial and supplemental reports. (ECF Nos. 95-8 and 95-3.) Dunn has provided an affidavit for purposes of the pending motion in which he takes issue with the conclusions of Reuschling relative to the projected path of Dedicated's tractor-trailer to the point where it allegedly struck the guy wire anchoring system. (ECF No. 93-2.) According to Dunn, "[t]he motion of the five-axle articulated vehicle, as described by the TransCon CSI drawings, is physically impossible, because the paths of all five (5) axles on the vehicle do not and cannot follow the laws of physics that govern the motion of that vehicle." (Dunn Affid. p. 2, ECF No. 93-2.) Dunn states that "[t]here are only two ways to accurately represent the actual motion of the subject articulated vehicle: drive the actual vehicle, or use mathematic vehicle dynamics models that have been developed for this purpose." (Id.) Dunn asserts that, unlike the mathematic vehicle dynamics models utilized in S-E-A's analysis, Reuschling's method of calculating the vehicle's path has "no basis in physics, and [is] not accepted by the accident reconstruction or vehicle dynamics communities." (Id.) Dunn represents that the vehicle dynamics simulations that were run by S-E-A could not reproduce the path of the vehicle as depicted by Reuschling, thereby proving that Reuschling's theory as to the

movement of the vehicle is not physically possible. Dunn also faults Reuschling's analysis in that, when Reuschling placed passenger cars into the accident scene to simulate obstacles that the tractor-trailer had to avoid, Reuschling did so without an accurate basis for determining the placement of the vehicles.

### 4. The Parties' Respective Arguments

Based on the criticisms set forth in Dunn's affidavit and S-E-A's supplemental report, Dedicated seeks to exclude Reuschling's opinion concerning the movement of Dedicated's tractor-trailer and the manner in which the trailer allegedly made contact with the guy wire. According to Dedicated, Reuschling's opinion fails to satisfy the standards for admissibility under Rule 702 and *Daubert v.Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993), because: (i) Reuschling essentially placed the tractor-trailer where he wanted it to be in his computerized depictions rather than utilizing the only two accepted methods for tracking the movement of a tractor-trailer; (ii) Reuschling placed other vehicles into his depiction of the parking lot based on footage taken after the fire, despite the fact that some of the vehicles in question had likely been moved between the time of the fire and the time that the footage was taken; and (iii) Reuschling failed to consider the necessary lag time that would have occurred between the time the trailer supposedly contacted the guy wire and the time that the service wires dynamically drooped low enough to be snagged by the trailer.

Based on its challenges to the opinion testimony of Reuschling, Dedicated also seeks to exclude the opinion testimony of Robert A. Simpson. Dedicated argues that, because the methodology employed by Reuschling is improper and the tractor-trailer could not have made contact with the guy wire as the Reuschling opines, Simpson's opinion testimony – which relies on Reuschling's conclusions – must similarly be excluded.

Penn Power responds that Dedicated's criticisms as to the depictions in Reuschling's report concern his use of visual aids that are separate from his underlying opinion and, as such, Dedicated's criticisms do not state a proper basis for excluding Reuschling's expert opinion. In addition, Penn Power argues that the criticisms of Reuschling's depictions based on the results of S-E-A's vehicle dynamics analysis are unfounded because: (a) S-E-A did not provide its computerized vehicle dynamics program with precise data concerning the location of the tractor-trailer as it appeared in Reuschling's depictions, and (b) S-E-A assumed an inaccurate trailer width when computing the path of the vehicle. As to Dedicated's criticism that Penn Power's experts do not account for the time lag that would occur between the striking of the guy wire and the lowering of the service wires, Penn Power argues that the effect of any such time lag is inconclusive inasmuch as S-E-A does not definitively opine that consideration of the time lag renders Penn Power's theory implausible.

B. Discussion

"In general, expert testimony must meet specific requirements, pursuant to Fed. R. Evid. 702, to be admissible: (1) the witness must be sufficiently qualified, (2) the testimony must be reliable, and (3) the testimony must assist the trier of fact, in other words, it must be relevant and 'fit' the facts of the case." *Henry v. St. Croix Lumina, LLC,* 572 F. App'x 114, 117 (3d Cir. 2014).[2] "The Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact," *Pineda v. Ford Motor Co.,* 520 F.3d 237, 243 (3d Cir. 2008), and Rule 702 in particular "has a liberal policy of admissibility." *Id.* (quoting *Kannankeril v.*

---

[2] Rule 702 provides that: "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997)). In this case, the Court finds that all three of the required elements – qualifications, reliability, and relevance – are satisfied.

### 1. Qualifications

Rule 702's qualifications element requires "that the witness possess specialized expertise," *Pineda,* 520 F.3d at 244 (internal quotation mark and citation omitted), and our circuit court of appeals has interpreted this requirement liberally, such that "a broad range of knowledge, skills, and training qualify an expert." *Id.* (internal quotation marks and citation omitted). Based on the record at hand, the Court finds that Reuschling is clearly qualified to render expert opinions in the field of accident reconstruction. Reuschling served for eleven years with the Maryland State Police and worked in commercial vehicle enforcement and automotive safety enforcement as an accident reconstructionist for the majority of his tenure. In addition, he has taught courses in commercial vehicle accident investigation and has testified numerous times in both civil and criminal proceedings as an expert in the fields of accident investigation and commercial vehicle inspections. Over the course of his career, Reuschling estimates that he has handled over 1,400 accident reconstructions. (Reuschling CV, ECF No. 101-3; Reuschling Depo. 9:8-9, 13:18-19, ECF No. 93-5.) Accordingly, Reuschling possesses the specialized expertise necessarily to qualify as an expert in accident reconstruction, particular as it concerns vehicular collisions.[3]

### 2. Reliability

_____

[3] The Court notes that, in his deposition testimony, Reuschling foreswears any intent to testify on matters such as what force was exerted on the utility pole when the trailer impacted the guy wire anchor, how much force was needed to break the utility pole, or the direction of force caused by the tire coming into contact with the anchor. (Reuschling Depo. 53:19-54:15, ECF No. 93-5.) To the extent Dedicated has concerns about Reuschling testifying in these areas, or any other areas that are ostensibly outside the scope of his expertise, such concerns can be addressed by way of a motion in limine prior to trial.

To be admissible, an expert's testimony must also be reliable; that is, it "must be based on the methods and procedures of science rather than on subjective belief or speculation; the expert must have good grounds for his [or] her belief." *Furlan v. Schindler Elevator Corp.*, 516 F. App'x 201, 205 (3d Cir. 2013) (*quotin*g *In re Paoli R.R. Yard PCB Litig. (Paoli II),* 35 F.3d 717, 742 (3d Cir. 1994)).

Dedicated's challenges to Reuschling's testimony focus primarily on considerations of reliability, especially as it relates to Reuschling's theory of how the tractor-trailer allegedly came into contact with the guy wire anchoring system. In particular, Dedicated argues that Reuschling's methodology of tracking the movement of the subject tractor-trailer is unreliable because the computerized technology utilized by Reuschling does not show continuous movement of the vehicle and is inconsistent with the laws of physics. In addition, Dedicated contends that Reuschling's software program has not been peer-reviewed or shown to be an accurate method of tracking vehicular movement and is not generally accepted in the field of accident reconstruction and vehicle dynamics.

The Third Circuit Court of Appeals has approved the use of the so-called "*Daubert* factors" as "useful tools for determining the reliability of expert testimony." *Henry*, 572 F. App'x at 117. These may include consideration of:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Henry,* 572 F. App'x at 17 (*quoting Pineda v. Ford Motor Co*., 520 F.3d 237, 247–48 (3d Cir. 2008)). Dedicated maintains that Reuschling's computerized illustrations do not satisfy these factors and instead present a totally unreliable depiction of the supposed movement of the

tractor-trailer to the point of impact with the guy wire. In essence, Dedicated argues that Reuschling has substituted his own subjective illustrations as a substitute for tracking the precise, continuous path of the tractor-trailer, as a mathematic vehicle dynamics analysis would do.

Having reviewed the record in this case, the Court does not agree that Reuschling's opinion should be excluded simply because it is not premised on the use of a mathematic vehicular dynamics program. The Third Circuit Court of Appeals has noted that "expert testimony does not have to obtain general acceptance or be subject to peer review to be admitted under Rule 702." *Schneider ex. rel Estate of Schneider v. Freid*, 320 F.3d 396, 406 (3d Cir. 2003). "Indeed, in *Daubert*, the Supreme Court specifically held that Rule 702 overruled the requirement that an opinion must gain general acceptance in order to qualify as admissible expert testimony; instead general acceptance and peer review are only two of the factors that a district court should consider when acting as gatekeeper." *Id*. (citing *Daubert*, 509 U.S. at 589). Moreover, the *Daubert* factors "are neither exhaustive nor applicable in every case," *Pineda v. Ford Motor Co.,* 520 F.3d at 248 (quoting *Kannankeril,* 128 F.3d at 806-07 and citing other authority), and "[t]he inquiry envisioned by Rule 702 is … a flexible one." *Id.* (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 594 (1993)) (ellipsis in the original). *See also Kumho Tire Co., Ltd. v Carmichael,* 526 U.S. 137, 151 (1999) (*Daubert* factors will not necessarily always be applicable to every instance in which the reliability of scientific testimony is challenged).

In any event, however, the Court notes that Reuschling's computerized depictions are derived from his use of high definition laser scanning technology which, according to Reuschling's report, "produces point cloud data accurate within 4-6 mm." (Reuschling Report at 11.) Reuschling represents that the accuracy of this technology has been "routinely accepted in

courts throughout the United States" (id.), has "passed both the Daubert and Frye challenges" (id.), and is used by architects, engineers and surveyors to document existing conditions. (Id. at 10.) Using this technology, Reuschling has attempted to create a three dimensional, high definition computerized model of the scene and subject vehicle based on their actual dimensions, so as to simulate the movement of the tractor-trailer and measure the distance between the top of the trailer and the bottom service wire. (Reuschling Depo. 18:1-21; 23:8-18.) To enhance the accuracy of his model, Reuschling studied photographs and footage of the accident scene to try and reproduce, based on the best available information, any relevant obstacles such as other vehicles that were present on the dealership grounds at the time of the accident. (*See id. generally* at 26-29; 66:4-9.) In developing his theory as to the vehicle's likely path of travel, Reuschling considered not only the physical dimensions of the tractor-trailer and the dealership grounds, but also circumstantial factors such as the physical condition of the recovered guy wire anchor, which Reuschling considers to be consistent with contact. (Id. at 38:12-13; 45:7-46:7.) Reuschling also considered Harris's and Lirette's accounts of the event, including their testimony as to the vehicle's general path of travel. (Id. at 60:5-61:3.)

Given all of these considerations as well as Reuschling's extensive training and experience in commercial vehicle accident reconstruction and Rule 702's liberal policy in favor of admissibility, the Court finds that Reuschling's opinion is based on sufficiently sound methodology so as to meet the reliability requirement of Rule 702. To the extent Dedicated's experts point to flaws in Reuschling's technology or his placement of the vehicle at various points in time, these objections go to the weight of Reuschling's opinion, and not its admissibility. As our Court of Appeals has observed:

> *Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is

correct.  As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process–competing expert testimony and active cross–examination–rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. In short, Daubert neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance. It demands only that the proponent of the evidence show that the expert's conclusion has been arrived at in a scientifically sound and methodologically reliable fashion.

*U.S. v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citation omitted).

With respect to Dedicated's conclusions that Reuschling's depiction of the tractor-trailer's movement contracts the laws of physics and cannot be reproduced using a mathematic vehicle dynamics model, Penn Power responds that these conclusions are borne of flaws in S-E-A's own analysis.  Specifically, Penn Power argues that S-E-A could not duplicate Reuschling's depictions with its vehicle dynamics software because S-E-A failed to enter accurate data about the location of the vehicle as depicted by Reuschling, and S-E-A also used an inaccurately narrow dimension relative to the width of the subject trailer.  Based on these competing arguments, it is clear that the parties are disputing foundational factual issues that should be tested on cross-examination and ultimately resolved by the finder of fact.

Dedicated has also challenged Reuschling's opinion on the grounds that Reuschling superimposed other vehicles into his computerized model of the parking lot without establishing a sufficient basis as to where the vehicles should be placed.  Here again, Dedicated's challenges may potentially affect the weight that the jury gives to Reuschling's opinions, but they do not render his opinions so speculative as to be inadmissible.  Reuschling testified that, in superimposing the vehicles onto his computerized model, he "painstakingly went through everything possible to determine how many and what vehicles were back there."  (Reuschling Depo. 26:17-19.)  To that end, he credited Harris' representation that there were about 15-20 vehicles in the back parking lot just prior to the fire (*id*. at 36:5-8), and he attempted to

reconstruct their location based on the best available evidence – namely film footage or photographs of the scene taken at the time of the fire and later that same morning. (*See generally id.* at 26-36.) Of particular importance are two vehicles, a brand new pickup truck lacking any tags and a white truck with a plow, which Reuschling believes were situated in such a way as to alter the tractor-trailer's approach to the alleyway, leading to the "off-tracking" event that Reuschling believes resulted in the tractor-trailer contacting the guy wire. (*See* generally Reuschling Depo. at 61:12-14, 64:5-21, 66:10-67:5; Reuschling Report at Fig. 18-20.) Although Reuschling agreed that some of the cars may have been moved from the time of the fire to the time they were picked up on the footage (id. at 27), he was confident that the new pickup truck was present at the time of the fire, as depicted in footage from a news account covering the actual fire (*id*. at 32:16-34:2; 36:2-5.)), and he felt "pretty sure" that the plow vehicle was also present in the location depicted in his model. (Id. at 66:15-17.) To the extent Dedicated disputes the accuracy of Reuschling's assumptions about the placement of the vehicles in his computerized model, this dispute concerns foundational facts which are properly reserved for the jury's consideration with the full benefit of vigorous cross-examination. *See Daubert v. Merrell Dow Pharm. Inc*., 509 U.S. 579, 596 (1993) ("Vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Dedicated also criticizes Penn Power's experts for their failure to consider the lag time that would have occurred between the moment that the trailer made contact with the guy wire and the point at which the service wires drooped low enough to catch the top of the trailer. Penn Power argues in rebuttal that even S-E-A's report is inconclusive as to whether lag time would affect the analysis. As Penn Power observes, S-E-A's supplemental report notes only that, "[i]f

the right-side tires of the subject trailer struck the guy-wire, …the right-front corner of the trailer *may or may not have already passed under the service conductors*…" (Penn Power's Br. Opp. Mot. Exclude Expert Op. 9, ECF No. 101 (quoting S-E-A Supplemental Report at 1, ECF No. 93-3) (emphasis added).) Once again, the Court finds that this dispute goes to the weight of the opinions proffered by Penn Power's experts, not their admissibility. Accordingly, the Court is satisfied that the opinions of Reuschling and Simpson meet the reliability standard of Rule 702.

### 3. Relevance

Finally, the Court finds that Reuschling's testimony will assist the trier of fact and is relevant to the facts of the case. *See Henry,* 572 F. App'x at 117. This litigation involves a relatively narrow dispute as to the precise cause of Penn Power's utility wires coming into contact with Dedicated's tractor-trailer. The only witnesses present on scene as the accident unfolded were Dedicated's two agents – Harris and Lirette, who were seated in the front of the tractor. Both men deny striking the guy wire, but their vantage point was arguably limited due to their position within the vehicle. There are no witnesses who observed the alleged contact between the vehicle and the guy wire. Accordingly, resolution of the disputed causation issue depends heavily on theories of accident reconstruction and interpretation of circumstantial evidence in light of the laws of physics. Clearly, a jury is better able to understand the pertinent circumstantial evidence and resolve the issue of causation with the help of expert testimony. Penn Power's experts have opined on matters that go to the heart of the disputed causation issue and, therefore, the Court has no trouble concluding that their testimony is relevant and "fits" the facts of this case.

In sum, Reuschling's testimony satisfies all three criteria for admissibility under Rule 702. Dedicated's motion to exclude his testimony will therefore be denied. Dedicated has also

moved to exclude Simpson's testimony to the extent it relies upon and incorporates Reuschling's conclusion that the tractor-trailer impacted the guy wire anchoring system. Because Reuschling's testimony as to this point is admissible, Simpson's testimony in reliance thereon is likewise admissible. Accordingly, Dedicated's motion to exclude the expert opinion of Simpson will also be denied.

## V.    Conclusion

Based upon the foregoing reasons, Dedicated's motion to dismiss and/or for a negative inference based on Penn Power's alleged spoliation of utility equipment (ECF No. 95) will be denied. Penn Power's motion for sanctions based on Dedicated's alleged spoliation of evidence relating to the tractor-trailer (ECF No. 97) will also be denied. Finally, Dedicated's motion to exclude the opinion testimony of Penn Power's experts (ECF No. 93) will be denied.

An appropriate order follows.


*/s/ Nora Barry Fischer*

Nora Barry Fischer
United States District Judge


Dated: December 19, 2014

cc:    All counsel of record (via CM/ECF)